Cite as 2015 Ark. App. 288

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV-14-925

| | |
|---|---|
| EMERGENCY AMBULANCE SERVICE, INC., and AIG CLAIMS, INC. | **OPINION DELIVERED** MAY 6, 2015 |
| APPELLANTS | APPEAL FROM THE ARKANSAS WORKERS' COMPENSATION COMMISSION [NO. G106949] |
| V. | |
| CARLA BURNETT | |
| APPELLEE | AFFIRMED |

## ROBERT J. GLADWIN, Chief Judge

Emergency Ambulance Service, Inc., and AIG Claims, Inc., appeal the Arkansas Workers' Compensation Commission's (Commission) September 15, 2014 opinion finding that appellee Carla Burnett was entitled to additional medical treatment but finding her claims for permanent total-disability benefits and wage loss and appellant's entitlement to credit for overpayment of temporary total-disability benefits premature and not ripe for determination.[1] Appellants contend that substantial evidence does not support the

---

[1]The Commission affirmed and adopted the opinion of the administrative law judge (ALJ). Typically, on appeal to our court, we review only the decision of the Commission, not that of the ALJ. *Death & Permanent Total Disability Trust Fund v. Myers*, 2014 Ark. App. 102. However, when the Commission affirms and adopts the ALJ's opinion, thereby making the findings and conclusions of the ALJ the Commission's findings and conclusions, our court considers both the ALJ's opinion and the Commission's opinion. *Id*.

Commission's decision to award additional treatment and that the Commission erred when it reserved issues on behalf of appellee. We affirm.

At the hearing before the ALJ, appellee testified that she was a sixty-year-old high school graduate. After high school, she attended two years of college studying physical education, and completed a two-year vo-tech program in one year, obtaining a certificate in computerized accounting. Appellee then worked in a CPA's office performing computer work until her husband asked her to stop working. She then went to EMT school in 1997 and obtained a certificate to work as an emergency medical technician (EMT). She began working as an EMT in 1997–98 at DeWitt Hospital. Appellee had been working for Emergency Ambulance Services, Inc., for almost sixteen years which, on August 6, 2011, when she suffered a compensable low-back injury while unloading a patient by stretcher from an ambulance.

Appellee testified that she had prior back problems as early as 1992. She explained that her symptoms after the August 6, 2011 incident were different than the ones she had before the incident. She said that the incident caused shaking, trembling, and the inability to lift. She testified that her prior back problems had never prevented her from working. She had a back injury in April 2002 and was treated by Dr. Barry Baskin but was not ever off work due to that injury. After the injury in August 2011, she could no longer mow the yard. She explained that it initially affected one side of her body—the outside of the right side of her leg—but that it now affects both sides of her leg. She testified that she cannot lift or squat; requires help getting dressed and getting in and out of the shower at times; can no

longer get in the bathtub; is limited on how long she can stand to cook; can lift a gallon of milk or an iron skillet at the most; and is able to go grocery shopping but cannot carry the groceries. She said that her husband helps with these issues. Appellee testified that she currently had problems in her legs, low back, and bottoms of her feet. She explained that she had no problems in those areas prior to the August 6, 2011 injury. She said that she had previously undergone a nerve-conduction test, but could not recall the date.

Appellee said that she had not worked since August 6, 2011. She testified that she was only able to sit comfortably for approximately thirty minutes, she could stand for five-to-ten minutes, and she was no longer able to garden or play with her grandchildren. She described a good day as going outside to swing in the yard. She claims that on a bad day she could not get up at all because she had no feeling in her legs.

She testified that she could not work at a cleaners because she could not stand for extended periods of time. She testified that she could not work at the desk job for a CPA because she was not able to sit for extended periods of time. She could not work as an EMT because she could not lift, push, or pull. She was able to drive but was unable to ride in a car for an extended period of time.

On cross-examination, appellee testified that she had let her EMT certificates lapse, but not her CPR certification. She said that she was also injured in April 2002 when lifting a pregnant woman who weighed over 400 pounds. She explained that she injured her low back and was initially seen by a company doctor, who ordered an MRI and referred her to Dr. Reza Shahim and Dr. Baskin. Dr. Baskin ordered a TENS unit and prescribed muscle

relaxers and pain pills. She had muscle spasms and numbness in her right leg. She testified that she had recovered one hundred percent and had no continuing symptoms or complaints from that injury. Appellee testified that she began drawing social security disability benefits of $980 per month due to her back problems and depression in October 2013.

The parties stipulated that Randy Burnett's testimony would be that he was appellee's spouse and had known her well several years before August 6, 2011. He had the opportunity to observe her during that period of time and did not see her demonstrate any limitations related to physical problems at that time. Since August 6, 2011, he had seen her demonstrate the limitations consistent with her testimony.

Medical records reflect that appellee sought treatment with Dr. Stan Burleson with complaints of persistent back pain after twisting on October 19, 1992. He noted that she had a pop and was experiencing muscle spasms. He also noted that she had been seen by a chiropractor that morning and had undergone x-rays. She returned to Dr. Burleson on October 26, 2001, with complaints of severe lower-back pain and numbness in her legs.

On September 19, 2002, appellee was seen by Dr. Baskin after a work injury on April 6, 2002. She complained of persistent numbness down her right leg and pain in her low back. She underwent an MRI on September 28, 2002, which revealed "leftward eccentric diffuse annular disc bulging at L4-5 with a small left posterclateral annular fissure and no neural impingement. Mild degenerative changes in the facets bilaterally at L4-5 and L5-S1." She returned for a follow-up with Dr. Baskin on October 10, 2002, and reported that the therapist had done only a few exercises with her and was less than adequate. She also

SLIP OPINION

reported that Bextra had not helped and that she had also taken Darvocet. He noted that she had an annular tear at L4–5 and discogenic pain syndrome. Dr. Baskin referred her for a steroid injection, which she had on October 18, 2002. She returned to Dr. Baskin on November 5, 2002, and he noted that the injection had been beneficial for a few days but the pain had come back and was severe. She admitted to severe depression. He administered an injection and prescribed Zoloft, Darvocet, and Xanax. He noted that her tear and bulge were on the left side but that her pain was in the right low back and leg.

Appellee underwent another MRI on March 6, 2003, which revealed

mild degenerative disc disease with asymmetric broad based bulge to the left L4–5 level as before. Associated posterior lateral annular tear to the left is seen. The neural foramen and central canal are grossly patent. Mild degenerative disc disease at L5–S1 level without significant central canal stenosis or foraminal narrowing as above.

Appellee returned to Dr. Baskin on June 19, 2003, and reported that she was worse than she had been in November 2002. She continued to complain of low-back pain, right-hip pain, and right-leg numbness. She also reported that there had been several occasions over the last few months where her leg had given way. Dr. Baskin referred her to Dr. Shahim.

Appellee was evaluated by Dr. Shahim on July 28, 2003. She reported low-back pain, numbness in her right leg to her foot, and pain in her entire right leg. He referred her for a CT lumbar myelogram. On October 7, 2003, she returned to Dr. Shahim, who reviewed the MRI and myelogram and noted that the myelogram revealed no evidence of nerve-root compression or canal stenosis. He noted that the MRI revealed an annular tear but no disc herniation. Dr. Shahim opined that he did not think appellee was a surgical candidate and

the test results did not explain the leg numbness. He noted that the annular tear could cause back and hip pain and recommended pain management. Dr. Shahim noted that appellee did not want to be evaluated by pain management at that time.

Appellee returned to Dr. Burleson on September 22, 2004, with complaints of persistent numbness and pain in her leg and foot. She underwent another MRI on October 4, 2004, which revealed "no significant degenerative disc disease. There is minimal focal subligamentous disk protrusion at L4–5. There is no evidence of central canal or foraminal stenosis."

Appellee underwent another MRI on January 6, 2006, at Stuttgart Regional as a result of complaints of back pain due to a fall. The January 2006 MRI revealed "[m]ild disc desiccation noted at L4/5. No evidence of traumatic injury. No evidence of significant disc pathology."

Appellee underwent a nerve-conduction study on June 16, 2009. At that time, she reported that she had fallen out of an ambulance and landed on her back in 2000. On October 12, 2009, she was treated by Dr. Richard Wilson for problems of anxiety due to family issues and chronic back pain. She was prescribed Prozac and Ultram.

Appellant returned to Dr. Wilson on January 28, 2011, with complaints of depression and chronic back pain. He prescribed Effexor, Flexeril, Klonopin, and Ultram. He had a long discussion with her about bipolar disorder.

Appellee began treating with a nurse practitioner, Suzette Boyd, on March 17, 2011, with complaints of lower leg pain on both the left and right sides with aching and tingling

in her legs. She returned to Ms. Boyd on April 4, 2011, with complaints of chronic back pain that was moderately limiting her activities. She was given a Toradol injection.

On August 19, 2011, appellee underwent another MRI due to a "lifting injury," which revealed "[n]o acute abnormalities visualized." On September 12, 2011, Dr. Shahim stated in a report that appellee's symptoms had been ongoing since August and she had a pain level of 9/10. Her symptoms were a headache; palpations; change in bowel habits; difficulty controlling urination; muscle extremity weakness; painful, swollen joints; anxiety and depression. She returned to Ms. Boyd on September 13, 2011, with complaints of back pain and depression.

On October 7, 2011, Dr. Shahim referred her for a CT scan and a myelogram. The CT scan revealed "[v]ery mild multilevel spondylolytic changes of the lumbar spine manifesting most prominently as moderate facet degeneration at L4–5 without significant mass effect on the canal or foramen at this or any other level." The myelogram revealed "L4–5 facet degeneration without significant canal or foraminal stenosis demonstrated."

On October 10, 2011, Dr. Shahim noted that appellee had lumbar radiculopathy. He noted that the CT myelogram revealed that there was significant foraminal stenosis at right L4–5 with facet arthropathy and facet disease at L3–4, L4–5, and L5–S1 with lateral recess stenosis at L4–5. He recommended a multilevel facet injection and noted that she may ultimately require surgical decompression. He issued a return-to-work slip indicating that she could return to full duty on November 11, 2011.

On November 16, 2011, appellee returned to Dr. Shahim for follow-up. He noted that he would send authorization for epidural injections and facet blocks. He opined, "I do believe that her pain is a result from a work-related injury. She denies any previous pain prior to the injury. She was not having any back or leg symptoms prior to the injury and her symptoms are primarily due to the work-related injury."

On December 1, 2011, appellee returned to Dr. Shahim for evaluation. He noted that he had reviewed the MRI of the lumbar spine and disagreed with the interpretation. He noted that appellee had "lateral recess stenosis and facet disease," and he noted that there was not an acute disc herniation, but there was foraminal stenosis at L4–5 and L5–S1 due to facet arthropathy. He noted that the CT lumbar myelogram showed "lateral recess stenosis and facet arthropathy, particularly at L4–5 and L5–S1."

Appellee returned to Dr. Shahim for evaluation on December 15, 2011. He noted, "Unfortunately her MRI was misread as a normal MRI." He noted that the myelogram showed significant facet disease and foraminal stenosis at L4–5 and L5–S1. They were still waiting for authorization for the injections. He also recommended physical therapy. On January 16, 2012, Dr. Shahim issued a return-to-work slip indicating that appellee could return to regular duty on March 17, 2012.

On February 28, 2012, appellee underwent a functional capacity evaluation (FCE). The evaluator noted that appellee gave a near full, though not entirely full, effort, and that she could do more physically at times than was demonstrated. He noted that she demonstrated the ability to sit for up to two hours and thirty-eight minutes, and dynamic

standing time was tested at thirty-seven minutes. She tested at the sedentary physical-demand level with lifting on an occasional basis. She tested at the medium physical-demand category for pushing and pulling over twenty feet on an occasional basis. The report concluded, "Overall, Ms. Burnett demonstrated the ability to perform work in the LIGHT classification of work as defined by the US Dept. of Labor's Guidelines."

On May 22, 2012, Dr. Reginald Rutherford noted that, based on appellee's FCE, she could work in a restricted capacity as defined by the details of the FCE. He noted that clinically she had "L5 radiculopathy right leg ." He recommended a selective right L5 nerve-root block for diagnostic confirmation and a series of lumbar epidural steroid injections with physical therapy. The recommended injections and follow-up MRI were denied by the workers' compensation carrier.

Appellee was evaluated by Dr. Kevin Collins on August 10, 2012. He noted that the only MRI that he reviewed in determining a five-percent impairment rating was dated August 19, 2011. He did not review the earlier MRI reports. He stated that if the earlier tests revealed a disc bulge that predated the August 2011 injury, then "obviously we cannot say the injury caused the disc bulge. If no bulge then indeed she developed this after her injury, then it would relate."

Based on the evidence as set forth above, the ALJ found as follows:

> In the instant case, the preponderance of the evidence demonstrates that the claimant suffered a compensable injury to her low back supported by objective medical findings. The claimant testified that she continues to have problems with her low back with radicular pain, numbness, and tingling in her lower extremities. Notwithstanding conservative treatment, the claimant contends she is worse off and is in need of further medical treatment. The medical evidence in this case reveals that

SLIP OPINION

the claimant had a preexisting disc bulge, which is revealed in MRI reports as early as 2002. All subsequent MRI reports are consistent with the 2002 findings. However, Dr. Shahim has opined that the MRI report from August 19, 2011, has been misread in light of his interpretation of the CT Scan and Lumbar Myelogram, which he contends reveals new objective findings of lateral recess stenosis and facet disease. He also notes there is foraminal stenosis at L4–5 and L5–S1 due to facet arthropathy. In light of these medical opinions, I find that the claimant has proven by a preponderance of the evidence that her request to return to Dr. Shahim for additional medical treatment is reasonable and necessary to reduce and alleviate her symptoms of pain and to maintain her healing and prevent further deterioration from any damage sustained by her compensable injury.

The ALJ also found that the issue of appellee's entitlement to permanent total-disability benefits and/or wage loss was premature and not ripe for determination because further medical treatment could alleviate some of appellee's symptoms. Also, because appellee was seeking to continue medical treatment, the ALJ found that appellants' entitlement to a credit for overpayment of temporary total-disability benefits was premature and not ripe for determination. Appellee appealed to the Commission, which affirmed and adopted the ALJ's decision. This appeal timely followed.

In appeals involving claims for workers' compensation, the appellate court views the evidence in the light most favorable to the Commission's decision and affirms the decision if it is supported by substantial evidence. *Target Corp. v. Bumgarner*, 2015 Ark. App. 112, ___ S.W.3d ___. Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion. *Id*. The issue is not whether the appellate court might have reached a different result from the Commission, but whether reasonable minds could reach the result found by the Commission. *Id*. Additionally, questions concerning the credibility of witnesses and the weight to be given to their testimony are within the exclusive

province of the Commission. *Id.* When there are contradictions in the evidence, it is within the Commission's province to reconcile conflicting evidence and determine the facts. *Id.* Finally, the court will reverse the Commission's decision only if it is convinced that fair-minded persons with the same facts before them could not have reached the conclusions arrived at by the Commission. *Id.*

Arkansas Code Annotated section 11-9-508(a) (Repl. 2012) requires an employer to provide an employee with medical and surgical treatment "as may be reasonably necessary in connection with the injury received by the employee." A claimant bears the burden of proving entitlement to additional medical treatment. *Bumgarner, supra.* What constitutes reasonably necessary treatment is a question of fact for the Commission. *Id.* The Commission has authority to accept or reject medical opinion and to determine its medical soundness and probative force. *Id.* Furthermore, it is the Commission's duty to use its experience and expertise in translating the testimony of medical experts into findings of fact and to draw inferences when testimony is open to more than a single interpretation. *Id.*

I. *Additional Medical Treatment*

Appellants contend that appellee has had back problems for many years, as established by her medical records, and is not entitled to additional medical treatment. She reported back pain with muscle spasms dating back to 1992. An MRI on September 28, 2001, showed facet degenerative changes at L4–5 and L5–S1, with a disc bulge at L4–5 with annular fissure. An MRI on March 6, 2003, showed that she had degenerative disc disease at L4–5 and L5–S1 as well as a bulge at L4–5 with an annular tear. Another MRI on October 4,

2004, showed a disc protrusion at L4-5, and she continued to complain of back pain on January 6, 2006, where another MRI showed disc desiccation at L4-5. In 2009, she complained of pain with muscle spasms and numbness in her right leg and in October 2009 she reported to Dr. Richard Wilson that she had chronic back pain as well as stress and anxiety. The January 2011 records also establish her back pain and tingling in her leg. In October 2012, Dr. Stan Burleson opined that appellee had discogenic pain syndrome. Thus, appellants contend that the records indicate that appellee suffered from back problems for almost twenty years prior to her work-related injury, and she was taking pain medications even up to the time of her injury.

Appellants stress that Dr. Collins stated that "if the disc bulge predated the injury, then obviously we cannot say the injury caused the disc bulge." Appellants argue that four MRIs prior to her work-related injury showed a disc bulge at L4-5, and her work-related accident did not cause the disc bulge. Appellants argue that the additional medical treatment that she seeks is to address her preexisting back conditions that have been documented since 2002.

Appellee maintains that the Commission's finding that she is entitled to additional medical treatment is supported by substantial evidence. She contends that her testimony and the medical records document that she experiences extremely severe pain in her low back, which radiates into both lower extremities, causes instability in her ambulatory ability, and affects her bowels and bladder function. She argues that the problems that she experienced prior to August 6, 2011, differ from the problems that she began to experience immediately after the incident and continues to experience since the injury occurred.

SLIP OPINION

A preexisting disease or infirmity does not disqualify a claim if the employment aggravated, accelerated, or combined with the disease or infirmity to produce the disability for which compensation is sought. *St. Vincent Infirmary Med. Ctr. v. Brown*, 53 Ark. App. 30, 917 S.W.2d 550 (1996). The test is whether the injury aggravates, accelerates, or combines with the condition. Here, the evidence was that, prior to the occurrence, appellee was able to perform the heavy manual requirements of her job; take care of household chores; provide for her own personal grooming; play with her grandchildren; play with her dogs; work in the yard; and maintain a relationship with her husband. Since the injury, she can no longer do these things. Thus, substantial evidence was presented that the injury aggravated, accelerated, or combined with the condition to cause her current disabling condition and need for medical treatment. We hold that fair-minded persons with the same facts before them could have reached the conclusions arrived at by the Commission—the injury combined with her preexisting condition, which was the disc bulge, to produce the disabling condition and need for medical treatment. The Commission gave credence to Dr. Shahim's note on November 16, 2011, that he believed appellee's pain was the result of a work-related injury and that appellee was not having any back or leg symptoms prior to the injury. Because questions concerning the credibility of witnesses and the weight to be given to their testimony are within the exclusive province of the Commission, the decision to award additional medical treatment is affirmed.

SLIP OPINION

II. *Remaining Issues*

Appellants cite *Sea Ark Marine, Inc. v. Pippinger*, 2009 Ark. App. 223, 303 S.W.3d 102, *Burkett v. Exxon Tiger Mart, Inc.*, 2009 Ark. App. 93, 304 S.W.3d 2, and *Gencorp Polymer Products v. Landers*, 36 Ark. App. 190, 820 S.W.2d 475 (1991), in support of their argument that the Commission erred when it did not decide all the issues that were litigated; instead, appellants claim that, as in the cases cited, the Commission erred by reserving issues after the hearing was held. They contend that the ALJ should have made a determination whether appellee sustained her burden of proof with the evidence on the record submitted by the parties.

We disagree. The ALJ made specific findings of fact that these issues were premature and not ripe for adjudication. The issues of appellee's entitlement to permanent total-disability benefits and/or wage loss were premature and not ripe for determination because further medical treatment could alleviate some of appellee's symptoms. Also, because appellee was seeking to continue medical treatment, the ALJ found that appellants' entitlement to a credit for overpayment of temporary total-disability benefits was premature and not ripe for determination. Accordingly, we find no error in the Commission's determination. *See Walker v. Fresenius Med. Care Holding, Inc.*, 2014 Ark. App. 322, at 12, 436 S.W.3d 164, 172 (not reaching the merits on the impairment-rating issue because it was premature based on holdings affirming the compensability of entitlement to additional medical treatment); *Serv. Chevrolet v. Atwood*, 61 Ark. App. 190, 197–98, 966 S.W.2d 909, 913–14 (1998) (where reservation of the issue of permanent disability for later determination

14

was justified in case of claimant who was splashed in the eye with acidic solution, where medical expert had not yet determined the degree of correctable impairment to eye)(*overruled on other grounds by Frances v. Gaylord Container Corp.*, 341 Ark. 527, 20 S.W.3d 280 (2000)); and *Cross v. Crawford Cnty. Memorial Hosp.*, 54 Ark. App. 130, 133, 923 S.W.2d 886, 888 (1996) (where appellate court found error in ALJ's denial of wage-loss disability benefits after it was determined that the issue was premature).

Affirmed.

ABRAMSON and HARRISON, JJ., agree.

*Worley, Wood & Parrish, P.A.*, by: *Melissa Wood*, for appellant.

*C. Michael White*, for appellee.