Cite as 2022 Ark. App. 132

# ARKANSAS COURT OF APPEALS
DIVISION IV
No. CV-21-253

| | |
|---|---|
| CARL WATSON | Opinion Delivered March 16, 2022 |
| APPELLANT | |
| | |
| V. | APPEAL FROM THE ARKANSAS WORKERS' COMPENSATION COMMISSION |
| HIGHLAND PELLETS, LLC; LIBERTY MUTUAL GROUP; AND DEATH AND PERMANENT TOTAL DISABILITY TRUST FUND | [NO. G808328] |
| APPELLEES | AFFIRMED |

## RITA W. GRUBER, Judge

Carl Watson appeals from a decision of the Arkansas Worker's Compensation Commission (the "Commission") denying his claim for benefits and finding he failed to prove that he suffered a compensable thoracic-spine injury as a result of a work-related fall. Watson argues that the evidence does not support the Commission's decision. We affirm.

Watson, who was fifty-four years old at the time of the hearing, worked for Highland Pellets, LLC, as a maintenance technician. Watson testified that on December 7, 2018, he was working on a piece of mobile equipment, lost his footing on the stairs, and fell approximately nine feet. He landed with his upper back on the bottom steps with his feet folded over his head. He was taken to Jefferson Regional Medical Center, x-rayed, and treated for multiple rib fractures on his right side. Highland Pellets accepted the claim as compensable. Watson followed up with Dr. Lester Alexander at Healthcare Plus.

When Watson continued to complain of pain, he was examined on January 22, 2019, by Dr. John Taylor at UAMS to evaluate the need for surgical intervention. Dr. Taylor determined that surgery was not an option because it was outside the seventy-two-hour window from the injury. He said ribs begin to calcify after seventy-two hours, and he could do more damage trying to repair them. Dr. Taylor recommended nerve blocks and pain management. Watson was treated at Pain Treatment Centers of America, where he complained of chest pain. He also continued treatment with Dr. Alexander, who returned Watson to light-duty work on March 28, 2019. Dr. Alexander ordered a CT scan of Watson's chest in late May when Watson complained of back pain. The CT revealed a compression fracture of Watson's spine at T7. Dr. Alexander referred him to OrthoArkansas, where he was initially treated by Nurse Practitioner Alicia Bell.

At OrthoArkansas, Bell ordered an MRI, which Watson underwent on July 8, 2019, seven months after the accident. The MRI revealed a "compression deformity of the T7 vertebral body with approximately 60% vertebral body height loss. Marrow signal at T7 is normal suggesting fracture deformity is chronic." The MRI was reviewed by Dr. Wayne Bruffett, who, like Dr. Taylor at UAMS, did not recommend surgical intervention. From a "spine standpoint," Dr. Bruffett indicated that Watson could return to work with no restrictions. Watson was advised to continue with Pain Treatment Centers of America for interventional treatment, to avoid bedrest longer than three days, and to continue normal activities as tolerated.

In a follow-up appointment, Watson was examined by Dr. Ikemefuna Onyekwelu at OrthoArkansas on October 10, 2019. Dr. Onyekwelu's notes state that Watson continued to complain of back pain due to an accident at work. Dr. Onyekwelu noted that Watson denied

any history of previous back complaints and noted that the ten-month-old work injury may have contributed to the compression fracture, which was "age indeterminate" on the MRI. But he noted that bones tend to heal within three months and stated that the MRI showed signs of "thoracic spondylosis and degenerative disc disease which are pre-existing." Finally, he stated that because Watson reported no history of pain in his back before the work injury, "it is within a certain degree of medical certainty that at least 51% of the patient's current symptoms are directly related to their work injury."

Watson was granted a change of physician to Dr. Scott Schlesinger at Legacy Spine and Neurological Specialists, whom he saw for a consult on November 12, 2019. Dr. Schlesinger ordered another MRI, which revealed a "moderate to severe remote anterior wedge compression deformity of T7." He diagnosed Watson with "pain in the thoracic spine" and "thoracic degenerative disc disease." Dr. Schlesinger noted that the two MRIs revealed "chronic compression deformity of T7," that there was "absolutely no way to know how long that compression deformity has been present," and therefore he could make no opinion regarding the relationship between the work injury and the thoracic abnormality. He said because Watson indicated that his pain began with the work-related fall and the rib fractures, he could state "within a reasonable degree of medical certainty that if in fact the history is accurate that the pain in his mid-thoracic and lower thoracic region is undoubtedly related to the accident. I would state this with greater than 51% certainty if the history is all accurate and consistent." He noted that there was nothing that could be done surgically but thought perhaps thoracic epidural injections might help. Dr. Schlesinger gave Watson a zero percent impairment rating for his thoracic compression.

Watson was referred to Dr. Carlos Roman at Proper Pain Solutions, LLC, for pain management. Dr. Roman administered epidural injections, but Watson reported no improvement thereafter. Dr. Roman conducted an independent medical evaluation (IME) on June 10, 2020, and opined that no further interventional procedures were indicated and that Watson had reached maximum medical improvement. He recommended Watson undergo a functional capacity exam (FCE), which was performed on July 10. The evaluator determined that Watson had demonstrated an unreliable effort and thus stated that the evaluation of ability to perform work in at least the light classification did not represent a true and accurate representation of his overall physical abilities. Watson testified that he tried to do everything on the FCE to the best of his ability, but he experienced pain with some of the movements. He said he has arthritis in his ankles and hands and grip-strength problems that preexisted his injury by decades. After the FCE, Dr. Roman indicated that he would put Watson back to work under a medium classification. He also opined that there would be no ratable impairment for Watson's work-related injury.

Watson said he had a cane at the FCE but did not use it. He admitted that the cane is partly psychological because he has had balance and control problems with his left leg. The cane is there to "steady" him. He said pain begins in his mid-back and becomes more intense as he moves around during the day. He testified that his left leg sometimes goes numb after he sits for a while. On cross-examination, he admitted that he had not seen anyone about his leg and need for a cane. Indeed, the notes from Dr. Onyekwelu ten months after the accident reflect that Watson denied any pain or weakness in his lower extremities. Watson testified that he did not, at that time, experience pain, merely numbness after sitting for a long period. He said the

4

condition has deteriorated since then. He was unable to explain why none of his medical records after that time include information about the issue with his leg or its connection to the work injury as he said that he had discussed the issue with each of his doctors.

Watson also testified that he had been injured in 2007 in a workplace accident in which he was struck in the face by a steel post and slid down a ladder he was on at the time. He remained off work for six months. He also admitted having been in several car accidents, the last of which occurred in early 2020. He and his wife were struck from behind on the interstate, and she was treated at the emergency room. The medical records do not reflect that he informed any of his doctors about the previous work injury or the car accidents.

On August 13, 2020, an administrative law judge (ALJ) held a hearing on Watson's claim for benefits due to the thoracic-spine injury. In an opinion issued October 5, the ALJ found Watson had failed to establish the necessary causal connection between his thoracic abnormalities and his work-related accident:

> In sum, on the basis of the record as a whole, I find that the Claimant failed to prove by a preponderance of the credible evidence that his need for treatment and disability for his thoracic spine problems arose out of and during the course of his employment, and that his T7 compression fracture and T5-6 disc protrusions are the result of the specific incident of December 7, 2018.

The Commission affirmed and adopted the ALJ's opinion. When the Commission affirms and adopts the ALJ's opinion, thereby making the findings and conclusions of the ALJ the Commission's findings and conclusions, we consider both the ALJ's opinion and the Commission's opinion in our review. *Emergency Ambulance Serv., Inc. v. Burnett*, 2015 Ark. App. 288, at 1, 462 S.W.3d 369, 370.

5

When the Commission denies benefits because the claimant has failed to meet his or her burden of proof, the substantial-evidence standard of review requires that we affirm if the Commission's decision displays a substantial basis for the denial of relief. *Osburn v. Pepsi Cola Metro Bottling Co.*, 2021 Ark. App. 157, at 6. The issue is not whether the appellate court might have reached a different result from the Commission but whether reasonable minds could reach the result found by the Commission; if so, the appellate court must affirm. *Id.* Credibility questions and the weight to be given to witness testimony are within the Commission's exclusive province. *Pack v. Little Rock Convention Ctr.*, 2013 Ark. 186, 427 S.W.3d 586. It is also within the Commission's province to weigh all the medical evidence and to determine what is most credible. *Minn. Mining & Mfg. v. Baker*, 337 Ark. 94, 989 S.W.2d 151 (1999). We have long held that the Commission's decision to accept or reject medical opinions and how it resolves conflicting medical evidence has the force and effect of a jury verdict. *St. Edward Mercy Med. Ctr. v. Chrisman*, 2012 Ark. App. 475, 422 S.W.3d 171.

Watson contends that the Commission erred in finding he failed to prove by a preponderance of the evidence that he suffered a compression fracture at T7 on December 7, 2018. He contends that his accidental fall on December 7 is undisputed as are the objective findings of his thoracic-spine injury. He points to the complete absence of evidence of a spinal injury before the accident coupled with the opinions of Dr. Onyekwelu and Dr. Schlesinger that the cause of the fracture was the work-related fall. Finally, he argues that even if the injury was preexisting, a preexisting injury is compensable if the incident aggravated, accelerated, or combined with the previous condition to produce the disability. Unfortunately, Watson did not

make this argument to the Commission. In fact, Watson argued at the hearing that he "never had any problems with this prior to the date of injury, and therefore the only explanation for the spinal cord injury is the date of injury, the accident at work." It is a basic rule of appellate procedure that a party cannot change arguments on appeal, and we do not address arguments that were not raised below. *Taylor v. Producers Rice Mill, Inc.*, 89 Ark. App. 327, 330, 202 S.W.3d 565, 567 (2005).

We now turn to the Commission's decision. The ALJ set forth a detailed factual summary of Watson's medical treatment after the injury and noted with emphasis Dr. Onyekwelu's opinion that the MRI showed evidence of an "age indeterminate compression fracture" in Watson's thoracic spine and Dr. Schlesinger's opinion that there was no way to know how long the compression deformity had been present if the July 2019 MRI was the first study of his spine. The ALJ stated that both doctors' opinions that the injury was related to Watson's fall at work specifically provided that the opinions were based on the accuracy of the history and information provided by Watson. The ALJ noted there was no evidence in the medical records regarding Watson's previous work-related accident, which resulted in injuries serious enough to require that he be off work for six months.

The ALJ found that when comparing Watson's testimony to the documentary evidence, she was "not persuaded [he] was a credible witness." She did not find Watson's testimony to be supported by the documentary medical records, finding no medical documentation to support any complaint of mid-back pain until April 29, 2019, over four months after the accident. Although Watson testified that he had complained of mid-back pain to Dr. Alexander and the doctors at Pain Treatment Centers of America before this time, the ALJ thought it highly

unlikely because there were no notes reflecting this in the charts. Moreover, in spite of Watson's testimony otherwise, the ALJ also doubted that he had alerted any of the physicians to his leg pain and need for a cane since none of the medical records included documentation about this issue either. The ALJ also noted that although Watson denied having any significant problems with his back before the work accident, he had performed heavy mechanical industrial-type work in construction and maintenance for the past few decades and had also done a lot of heavy lifting and industrial work. Further, she pointed out that Dr. Schlesinger and Dr. Roman both returned him to work with no permanent-impairment rating and that he claimed none of the physical therapy, injections, or medication had helped him with any degree of improvement. But Watson admitted having filed for unemployment benefits. Finally, the ALJ took into consideration the FCE evaluator's notations of Watson's moaning and groaning during the examination and the evaluator's conclusion that Watson put forth an unreliable effort.

Watson bore the burden of proving by a preponderance of the evidence that his injury arose out of and in the course of his employment; that the injury caused harm to his body that required medical services; that there was medical evidence supported by objective findings, as defined in Ark. Code Ann. § 11-9-102(16) (Repl. 2012), establishing the injury; and that the injury was caused by a specific incident identifiable by time and place of occurrence. *Odd Jobs & More v. Reid*, 2011 Ark. App. 450, at 4–5, 384 S.W.3d 630, 632. In this case, the Commission found that Watson had failed to prove by a preponderance of the evidence that the injury arose out of and in the course of his employment. The Commission is entitled to review the basis for a doctor's opinion in deciding the weight and credibility of the opinion. *Maverick Transp. v. Buzzard*, 69 Ark. App. 128, 10 S.W.3d 467 (2000). This is precisely what the Commission did

here. Its decision turned largely on Watson's credibility, his withholding of information from the medical doctors, and the weight and credibility the Commission attached to the doctors' opinions.

Watson asks us to reweigh the evidence and credibility findings made by the Commission; however, once the Commission has made its decision on issues of credibility, we are bound by that decision. *Tempworks Mgmt. Servs., Inc. v. Jaynes*, 2020 Ark. App. 70, 593 S.W.3d 519; *Thrapp v. Smith Blair, Inc.*, 2013 Ark. App. 683, at 8, 430 S.W.3d 810, 815. It was up to the Commission, as the finder of fact, to resolve issues of credibility and to weigh medical opinions and the evidence regarding causation of Watson's injury. We hold that the Commission's decision displays a substantial basis for the denial of relief, and we affirm its decision.

Affirmed.

BARRETT, J., agrees.

VIRDEN, J., concurs.

**BART F. VIRDEN, Judge, concurring**. I write separately to explain that, while I reluctantly agree that we must affirm this case, I could not disagree more with the decision of the ALJ and two of the commissioners. Further, and with all due respect, I disagree with the expressed reasoning in the majority opinion as to *why* we must affirm.

The decision below—and even our opinion issued today—hides behind the guise of a "credibility determination." We must live with the fiction that the Commission is in the best position to judge credibility, despite the fact that the Commission does not hear any testimony from witnesses. Workers' compensation is wholly a legislative creation, and as such, the Legislature enacts the law and promulgates the guidelines. Of note, blind deference to the

9

Commission's credibility findings is not found in the statutory enactments. On a partly academic exercise, one can try to trace the origin of what we now accept as unassailable. While chasing that rabbit down the hole, the case of *Brower Manufacturing Co. v. Willis*, 252 Ark. 755, 480 S.W.2d 950 (1972), emerges. It is of note for the following language:

> It was the duty of the commission to draw every legitimate inference possible in favor of the claimant and to give him the benefit of the doubt in making the factual determination. *Herman Wilson Lumber Co. v. Hughes*, 245 Ark. 168, 431 S.W.2d 487. Neither Thompson nor Cupp, either of whom was in position to contradict White's testimony if it was not true, appeared as a witness. No explanation for their absence is offered. As triers of the facts[,] the referee and the commission could properly draw the inference that the testimony of both these witnesses would have been unfavorable to appellants. *Arkansas State Highway Comm. v. Phillips*, 252 Ark. [206, 478 S.W.2d 27 (1972)]. The drawing of inferences, however, was for the commission and not the courts. *International Paper Co. v. Tidwell*, 250 Ark. 623, 466 S.W.2d 488.

*Willis*, 252 Ark. at 758, 480 S.W.2d at 951–52.

The *Tidwell* case was primarily one of jurisdiction. As to whether it supports the ironclad rule we now cite with regularity, I will let the reader decide. While we have abandoned the requirement of giving the claimant the benefit of the doubt, our deference to the Commission's inferences has gotten stronger as the years pass. This concept is understandable in the arena of circuit courts and would even make sense if we were to defer to the administrative law judge ("ALJ") on matters of credibility because the ALJ hears the testimony of the witnesses . . . but I digress, partly.

The problem is that all the Commission, or the appellee on appeal, has to do is say the magic words—"the decision was based on credibility"—and it's time to start the bus, so to speak. The decision in this case has nothing to do with credibility. Mr. Watson had neither complained of nor been treated for thoracic-spine pain before his work-related injury, and he had never been

10

diagnosed with a thoracic compression fracture, yet the ALJ and two of the commissioners apparently chose to believe that Mr. Watson *must* have had prior back problems. After all, he had done manual labor all of his life. The decision below cited the following reasons for finding that Mr. Watson was not credible:

(1) Mr. Watson had sustained a work injury to his head and face over ten years earlier, which he failed to mention to his doctors;

(2) Mr. Watson was involved in some minor "fender benders" in the 1980s for which he had received no treatment;

(3) Mr. Watson had been involved in a car accident since his injury at work. This was relied on, despite the fact that the wreck occurred *after* Mr. Watson's compression fracture at T7 was documented; and

(4) Mr. Watson failed to ensure that his doctors' records noted back pain separate from the pain that he experienced from his four broken ribs.

Neither the ALJ nor the Commission nor even the respondent explain why these "incidents" are material to a credibility finding regarding a recently documented—but previously asymptomatic—spine fracture.

No doubt Mr. Watson's thoracic compression fracture was "chronic" or "degenerative" and likely was not *caused* by the serious injury at work. I am equally certain, however, as it seems were the two expert doctors—the only ones to opine on the subject—that the workplace injury aggravated or exacerbated Mr. Watson's condition. It is within the Commission's province to weigh all of the medical evidence, to determine what is most credible, and to determine its medical soundness and probative force. *Minn. Mining & Mfg. v. Baker*, 337 Ark. 94, 989 S.W.2d 151 (1999); *LVL, Inc. v. Ragsdale*, 2011 Ark. App. 144, 381 S.W.3d 869. We have long held that the Commission's decision to accept or reject medical opinions and how it resolves conflicting

11

medical evidence has the force and effect of a jury verdict. *St. Edward Mercy Med. Ctr. v. Chrisman*, 2012 Ark. App. 475, 422 S.W.3d 171. In weighing the evidence, the Commission may not arbitrarily disregard medical evidence or the testimony of any witness. *Tempworks Mgmt. Servs., Inc. v. Jaynes*, 2020 Ark. App. 70, at 3, 593 S.W.3d 519, 522. But when the Commission chooses to accept the testimony of one physician over that of another, the appellate courts are powerless to reverse the decision. *Hernandez v. Wal-Mart Assocs., Inc.*, 2009 Ark. App. 531, at 3, 337 S.W.3d 531, 532 (citing *Ark. Wood Prods. v. Atchley*, 21 Ark. App. 138, 729 S.W.2d 428 (1987)). Here, however, there were no *competing* medical opinions. They were of the same accord.

It is no wonder that Mr. Watson did not pinpoint the source of his pain early in his treatment. Mr. Watson sustained displaced fractures of ribs 7, 8, 9, and 10. All were no doubt extremely painful individually and, even more so, collectively. He steadfastly complained of, and was treated for, pain by all of his doctors. The opinion of the Commission seems to be that Mr. Watson should have been able to articulate the difference in the pain from those broken ribs and the pain caused by the compression fracture of the T7 vertebrae and bulging discs at T5-6. By the way, the 7th and 8th ribs join the spine at, yes, T7.

Our court has recognized that an aggravation of a preexisting injury is compensable— often in cases where there was a known and previously treated injury— under the oft-repeated axiom, "An employer takes the employee as he finds him." *Parker v. Atl. Rsch. Corp.*, 87 Ark. App 145, 152, 189 S.W.3d 449, 453 (2004); *see also Conway Convalescent Ctr. v. Murphree*, 266 Ark. 985, 588 S.W.2d 462 (1979). Such should have been the case in the matter before us now.

Here then, finally, is why this is a concurrence and not a dissent: Mr. Watson did not argue below that he suffered an aggravation of a preexisting condition. I think this point deserves more than an incidental mention. Mr. Watson did not make this argument when he filed for additional compensation; he did not raise it in the prehearing questionnaire; and he did not verbalize it at the hearing before the ALJ. Rather, Mr. Watson took the position below that his thoracic compression fracture resulted from his fall at work. It was not until his appellate brief was filed with our court that he articulated the position taken, and well stated, by the dissenting commissioner. There is the rub. One might argue that, by alleging that his thoracic fracture was "a compensable injury," an aggravation of a preexisting condition was included by implication. One might argue that, but at this point in our jurisprudence, one would be wrong.

Lastly, it does not go unnoticed that, just as Mr. Watson had no control over what his doctors wrote in their notes or the delay in getting diagnostic tests performed, he also most likely had no idea of the importance of presenting his case from the outset as an aggravation of a preexisting injury. And that, as stated in the majority opinion, is unfortunate.

*Caddell Reynolds*, by: *Matthew J. Ketcham*, for appellant.

*Jason Ryburn*, for separate appellees Highland Pellets, LLC; and Liberty Mutual Group.