LVL, INC., and Chartis Insurance,
Appellants

v.

Donald RAGSDALE, Appellee.

No. CA 10–905.

Court of Appeals of Arkansas.

Feb. 23, 2011.

Melissa Faye Wood, Little Rock, for appellants.

Michael Scott Willhite, Jonesboro, for appellee.

RITA W. GRUBER, Judge.

LVL, Inc., appeals the Workers' Compensation Commission's June 1, 2010 decision that awarded Donald Ragsdale additional medical treatment related to his December 2006 compensable neck injury, which ultimately resulted in a cervical discectomy and fusion. LVL's sole point on appeal is that substantial evidence does not support the award of additional treatment recommended in 2009 by anesthesiologist Dr. Raymond Greaser, a specialist in pain management. We hold that substantial evidence does support the award; therefore, we affirm.

A claimant bears the burden of proving entitlement to additional medical treatment. *Patchell v. Wal–Mart Stores, Inc.,* 86 Ark.App. 230, 184 S.W.3d 31 (2004). The claimant may be entitled to ongoing medical treatment after the healing period has ended if the treatment is geared toward management of the compensable injury. *Id.* Arkansas Code Annotated section 11–9–508(a) (Supp.2009) requires an employer to promptly provide for an injured employee such medical and surgical treatment "as may be reasonably necessary in connection with the injury received by the employee." What constitutes reasonably necessary treatment is a question of fact for the Commission, which has the duty to use its expertise to determine the soundness of medical evidence and to translate it into findings of fact.

*Hamilton v. Gregory Trucking,* 90 Ark. App. 248, 205 S.W.3d 181 (2005).

Ragsdale was employed by LVL as a driver of an eighteen-wheeler delivering mail between Newport, Arkansas, and Chicago. He injured his back, neck, and left shoulder on September 20, 2006, while he was trying to unhook the truck's trailer. On December 13, 2006, he was seen by neurosurgeon Dr. Robert E. Abraham for complaints of left upper extremity and neck pain "made worse with extension or looking to the left." Findings of a cervical MRI included a large herniated nucleus pulposus described as "C6–7 large left greater than right HNP." Dr. Abraham's report shows, in part, an assessment of left cervical radiculopathy, a plan for an operative procedure at C6–7, and a myelogram. Dr. Abraham noted on December 26 that the myelogram revealed "no dye at C6–7 on the left, ... C6–7 NHP with root and cord impingement." Again assessing cervical radiculopathy, on January 3, 2007 he performed the C6–7 surgery, which included placement of bone allograft with anterior cervical plate, screws, and locking pins.

LVL paid total temporary disability benefits; medical benefits, including the cervical discectomy and fusion at C6–7 with internal fixation; and a twelve-percent impairment rating assigned by neurosurgeon Dr. Steven Cathey in a 2007 independent medical examination. In 2008 Ragsdale was granted a change of physicians from Dr. Abraham to Dr. Gregory Ricca for pain management. In May 2008 Ragsdale was referred to Dr. Greasey, who administered greater occipital nerve injections and cervical epidural injections over the following months.

In a letter of February 13, 2009, Dr. Greaser requested preauthorization for Phase I trials of spinal-cord neurostimulation therapy and peripheral-nerve-field neurostimulation therapy. The request

was based on an "intractable, debilitating pain disorder" related to a diagnosis of headache, cervical post-laminectomy syndrome, cervical spondylosis, chronic pain, chronic postoperative pain, cervicalgia, and cervical radiculopathy. Dr. Greaser noted the organic origin of Ragsdale's chronic pain, its three-year duration, and the failure of the "protracted clinical course involving cumulatively costly, ineffective conservative therapies" to provide sustained, effective relief. Dr. Greaser concluded that "the cost of endless ineffective conservative therapies far exceeds investment in a spinal cord and peripheral nerve field neurostimulation systems or the effective treatment of this life-long chronic pain disorder."

On May 4, 2009, Ragsdale underwent an independent medical exam by Dr. Terence P. Braden III, D.O., who had seen him in 2002 for bilateral hand paresthesia and pain when an EMG–NCV study performed on January 11, 2002, was positive for carpal tunnel syndrome. Subsequent medical notes indicated that carpal tunnel release could be scheduled at Ragsdale's convenience "as he has bilateral carpal tunnel syndrome worse on the left." In the 2009 independent medical exam, Dr. Braden assigned a fifteen-percent permanent impairment rating for radiculopathy.

On October 23, 2009, the administrative law judge conducted a hearing on three issues: whether Ragsdale was entitled to additional benefits for his compensable neck injury; whether he also sustained bilateral carpal tunnel syndrome at the time of the neck injury; and whether Dr. Braden's anatomical impairment rating for the neck conformed with American Medical Association guidelines and Commission rules. Ragsdale's medical records were introduced into evidence at the hearing, and he was the only witness to testify.

Ragsdale testified that he had continued his employment with LVL since the time of his injury, a job that he valued and wanted to keep. Ragsdale stated that his duties included loading the trailer and driving the round-trip route to Chicago; that it was difficult to perform his job because of his headaches, neck pain, and loss of strength in the left arm; and that he was requesting the additional medical care to lessen the pain. He explained that he could not take narcotics because of driving, he had tried other pain medications, and nothing had both given him relief and allowed him to do his job. He said he understood the limitations that the stimulators would cause and felt he could return to work after the procedure.

Ragsdale denied having problems before the 2006 accident with his left hand or arm, numbness or tingling, or reduced strength or mobility of his left arm. He said that after surgery his neck movement was restricted but better than before surgery, his arm pain was not as bad as after the accident, pain occurred when he bent his hands a certain way, and he woke in the middle of the night with his hand numb. He testified that he had passed two DOT physicals since the surgery and in April 2008 had received a change of physicians to Dr. Ricca, who discussed with him his habit of smoking.

The law judge's opinion noted that LVL had accepted medical expenses, temporary total disability benefits, and Dr. Steven L. Cathey's twelve-percent rating. The opinion included these findings:

As I interpret the medical evidence, the claimant remains symptomatic from the compensable neck injury. Treatment for pain is a reasonable and necessary medical expense.

. . . .

Based on the claimant's credible testimony and the opinions of Drs. Cathey,

Abraham, and Braden, the claimant suffers from radiculopathy related to the compensable neck injury entitling him to treatment for pain which is a reasonable and necessary medical expense pursuant to Ark.Code Ann. § 11-9-508. Respondents are directed to pay for Dr. Greaser's treatment within thirty (30) days of receipt pursuant to Rule 099.30.

The law judge noted that both Dr. Braden and Dr. Cathey had found residual radiculopathy at C7, but they had assessed impairment under different tables of the 4th Edition of the American Medical Association guidelines. She disregarded Dr. Braden's impairment rating because she found that he had not followed Commission precedent in making the assessment. She also found that Ragsdale had failed to prove his carpal tunnel syndrome arose out of and in the course of his employment, noting that Dr. Abraham and Dr. Greaser were unaware the condition had been diagnosed in 2002 and that surgery had been recommended then. The Commission adopted and affirmed the decision of the administrative law judge as the opinion of the Commission.

### Sufficiency of the Evidence

The only issue before us is whether there was sufficient evidence to support the award of additional treatment regarding the peripheral nerve field stimulator and the spinal cord stimulator. Where the sufficiency of the evidence is challenged on appeal, we review the evidence in the light most favorable to the findings of the Commission and will affirm if those findings are supported by substantial evidence. *Murphy v. Forsgren, Inc.*, 99 Ark.App. 223, 258 S.W.3d 794 (2007). Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.* We defer to the Commission's findings on what testimony

it deems to be credible, and the resolution of conflicting evidence is a question of fact for the Commission. *Hargis Transp. v. Chesser*, 87 Ark.App. 301, 190 S.W.3d 309 (2004).

As an initial matter, we note LVL's argument that the Commission "has only affirmed and adopted the Administrative Law Judge's opinion without doing an analysis of any kind." Not only does LVL make this complaint without citing authority, it is contrary to Arkansas law. It has long been settled that the Commission is permitted to adopt the administrative law judge's decision and that, in so doing, the findings and conclusions of the law judge become those of the Commission. *ITT/Higbie Mfg. v. Gilliam*, 34 Ark.App. 154, 807 S.W.2d 44 (1991). We further note that LVL refers to Ragsdale's request for "two costly, invasive procedures recommended by Dr. Greaser" but does not acknowledge Dr. Greaser's statement, based upon the relevant medical records, that the cost of neurostimulation in this particular case was far less than "endless ineffective conservative measures." LVL makes no convincing argument nor citation to authority in support of its position, and we will not address the issue on appeal. *E.g., Stutzman v. Baxter Healthcare Corp.*, 99 Ark.App. 19, 256 S.W.3d 524 (2007).

We address only LVL's specific argument that the evidence is not sufficient to support a finding that the procedures recommended by Dr. Greaser were for treatment associated with the compensable neck injury. LVL argues that because nerve-conduction studies showed no radiculopathy in 2006 and 2008, Dr. Greaser used inaccurate information when he requested spinal-cord stimulation on the basis of "cervical radiculopathy and cervicalgia." LVL further argues that the purpose of the nerve stimulator was treat-

ment of headache pain not caused by the work-related injury and that the awarded treatment addressed arm problems the Commission found not to be compensable.

The Commission acknowledged the seeming inaccuracy of Drs. Abraham, Cathey, and Braden's agreement that "the claimant suffers from *radiculopathy* as a result of the compensable injury which was *confirmed by the May 9, 2007, EMG/NCV study.*" (Emphasis added.) Commenting that the "conflicting test results and doctors' opinions" did "not inspire confidence," the Commission itself interpreted the medical evidence to conclude that Ragsdale remained symptomatic from the compensable neck injury. It further concluded that the recommended pain treatment was a reasonable and necessary medical expense for the injury.

 The Commission has authority to accept or reject medical opinion and to determine its medical soundness and probative force. *Oak Grove Lumber Co. v. Highfill,* 62 Ark.App. 42, 968 S.W.2d 637 (1998). It is the Commission's duty to use its experience and expertise in translating the testimony of medical experts into findings of fact. *Id.* It is the Commission's responsibility to draw inferences when testimony is open to more than a single interpretation, whether controverted or uncontroverted; when it does so, its findings have the force and effect of a jury verdict. *Id.*

Here, substantial evidence existed to support the Commission's findings that the pain-management procedures recommended by Dr. Greaser were reasonably necessary medical treatment in connection with Ragsdale's compensable injury. After acknowledging that post-operative nerve studies were negative for radiculopathy, the Commission found from Ragsdale's credible testimony and the opinions of three doctors that Ragsdale suffered

radiculopathy related to his compensable neck injury and thus was entitled to treatment under Dr. Greaser. This finding was based upon the Commission's exercising its duty to determine credibility and to interpret conflicting evidence, and we will not reverse it.

Medical evidence before the Commission supports its award of neurostimulation treatment as additional treatment related to Ragsdale's compensable injury. Neurosurgeon Dr. Abraham's 2007 office notes in the months after the cervical surgery documented chronic denervation/reinnervation at C5–6 and C6–7, as well as chronic pain with stiffness. June 2008 notes by the new treating physician Dr. Ricca show Ragsdale's complaints of "LT occipital head pain" and "LT cervical pain" radiating to his arm. The assessments Dr. Ricca listed were headache, cervical postlaminectomy syndrome, cervical spondylosis, chronic pain, chronic postoperative pain, cervicalgia, and cervical radiculopathy.

Notes from June through October 2008 by Dr. Greaser, who became the authorized treating physician, document conservative procedures attempted for pain management. Left greater occipital nerve injections were administered with assessments of headache, cervicalgia, and chronic pain. Left posterior C4–7 cervical epidural corticosteroid injections were given with assessments of cervical postlaminectomy syndrome, cervical spondylosis, and cervical radiculopathy. Dr. Greaser's February 2009 request for neurostimulation therapy recounted that neither these conservative therapeutic modalities nor medications had provided sustained, effective relief of pain. Dr. Greaser reiterated in October 2009 that Ragsdale's work-related accident resulted in his intractable, debilitating disorder involving his left head, neck, and arm, and that conservative therapies had been ineffective.

He opined that the proposed neurostimulation was reasonably necessary medical treatment for the injury.

The weight and interpretation of the medical evidence, on which this decision turned, are matters for the Commission. *Pyle v. Woodfield, Inc.*, 2009 Ark. App. 251, 306 S.W.3d 455. The evidence as summarized above constitutes substantial evidence to support the Commission's award of additional medical treatment at the direction of Dr. Greaser.

Affirmed.

PITTMAN and ROBBINS, JJ., agree.