RITA W. GRUBER, Judge. h Firestone Building Products and Sedg-wick CMS (collectively, Firestone) appeal a decision of the Arkansas Workers’ Compensation Commission regarding Pamela V. Hopson’s falls in the workplace on September 22, 2010. Firestone contends that (1) substantial evidence does not support the Commission’s decision that Hopson sustained a compensable injury, (2) neither the law nor substantial evidence supports the thirty-five-percent and thirty-two-percent impairment ratings assigned by the Commission, and (3) neither the law nor substantial evidence supports the Commission’s award of medical treatment for the injury. We disagree and affirm. Where the sufficiency of the evidence is challenged on appeal, we review the evidence in the light most favorable to the findings of the Commission and will affirm if those findings are supported by substantial evidence. LVL, Inc. v. Ragsdale, 2011 Ark. App. 144, 381 S.W.3d 869. Substantial evidence is relevant evidence that a reasonable mind might accept |?as adequate to support a conclusion. Id. We will not reverse a finding based upon the Commission’s exercising its duty to determine credibility and to interpret conflicting evidence. Id. I. Compensability The claimant bears the burden of proving that her injury was the result of an accident that arose in the course of employment and that the accident grew out of, or resulted from, the employment. Delaplaine Farm Ctr. v. Crafton, 2011 Ark. App. 202, 382 S.W.3d 689. The appellate court views the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Commission’s findings. Cedar Chem. Co. v. Knight, 372 Ark. 233, 273 S.W.3d 473 (2008). An employer takes the employee as it finds her, and employment circumstances that aggravate preexisting conditions are compensable. Heritage Baptist Temple v. Robison, 82 Ark.App. 460, 464, 120 S.W.3d 150, 152 (2003). An aggravation is a new injury resulting from an independent incident, and the aggravation of a preexisting, noncompensable condition by a compensable injury is, itself, compensable. Williams v. L & W Janitorial, Inc., 85 Ark.App. 1, 9, 145 S.W.3d 383, 388 (2004). In ERC Contractor Yard & Sales v. Robertson, 335 Ark. 63, 71, 977 S.W.2d 212, 216 (1998), our supreme court discussed the compensability of idiopathic falls in the workplace: An idiopathic fall is one whose cause is personal in nature, or peculiar to the individual. 1 Larson, Workers Compensation Law, § 12.11 (1998); [other citations omitted]. Because an idiopathic fall is not related to employment, it is generally not compensable unless conditions related to employment contribute to the risk by placing the employee in a position which increases the dangerous effect of the fall. Larson, supra. |sWhen a truly unexplained fall occurs while the employee is on the job and performing the duties of his employment, the injury resulting therefrom is compensable. Delaplaine, supra. In an interview by Firestone’s insurance carrier, Hopkins explained that her work entailed helping fold rubber that was machine-poured and pulling sheets of it up a ramp from the floor. She said that at 6:00 a.m. on September 22, 2010 — after sitting on a ramp and cutting tape off rollers — she stepped down, twisted off balance, and fell: “my right leg went to turn around, and my head was facing in one direction and my back was facing another direction. So when I got up, I had to make a pivot turn to the right, take my right leg over, and stepped down.” She said that a coworker who heard her call for help sent two men over; she told them she could not move because her leg was hurt; they placed her in a wheelchair; and they took her to first aid, where an ice pack was put on her knee and her blood pressure was taken. She denied having pain or trouble with her knee before the fall, and she said that she had taken her blood-pressure medication and ibuprofen before going to work that night. She stated that a doctor had previously treated arthritis in her ankle with medication; that she had undergone surgery for a uterine hemorrhage; and that two weeks before her fall, she had been kept off work because of high blood pressure. In the interview, Ms. Hopson related the following events that occurred after she sat in the wheelchair. She stood from the wheelchair to go to the bathroom, putting weight on her “other leg,” and fell a second time. She was asked if she could “make it out” to go home, and she said she would try to walk: “Bruce Yelverton [from management] grabbed my hand, a supervisor got behind me, and they helped me walk out of first aid. But, when we were j^outside of first aid, I fell again because my legs wouldn’t hold me up.” She explained that she did not have strength in her right leg when she fell the second time and that she fell on both knees during the third fall, with her left leg feeling “tender.” She stated that she went to her family-doctor at 11:30 a.m. that morning; he x-rayed her knees and told her that nothing was broken. In testimony before the administrative law judge, Hopson again described her three falls — hitting her right foot stepping off the ramp and landing on her right knee, falling forward onto her right knee when she stood to go to the bathroom and put her weight on the left, and falling on her left leg when her legs gave out in the parking lot. She again explained that the first fall occurred when she was taking tape off rollers near a ramp: I stood up and I began to step down, turning to my left, and my one shoe was already down close to the floor and ... I was stepping down and bringing my right leg over. That’s when my safety shoe ... hit the bar that’s on the floor and I lost my balance and went down. There is a metal bar between the ramp and the roller. As I stepped down off the ramp, my right foot, hit that piece of metal bar, I went off balance and hit the floor. When I fell I landed on my right knee, and I could not get back up. Hopson testified that Danny Glass came to Dr. Fox’s office when she was there the morning of her falls and told her, after talking to Bruce Yelverton by telephone, that “workers’ compensation would not pay for this.” She testified that she had been noncompliant about taking her blood-pressure medication over the years but had taken it the morning of the accident. She denied telling Dr. Fox that she was out of medication, denied telling Yelverton she had taken strong pain medication that day, and said that Dr. Fox’s report on the day of her falls that she had taken hydroco-done the last two days was “a mistake.” She testified that she had been concerned about her obesity impacting her ability to do her work, 15that she had long-time problems with her wrists and arms, and that her osteoarthritis had not affected her knees. She explained that a “Dr. Ben-net” [1] at Dr. Fox’s office told her the injury was not work related and had checked “no” on Firestone’s accident-and-sickness forms to indicate that her injury was not related to work. Hopson knew the check-mark had been made on the October 10, 2012 form, which she “felt was incorrect,” but she signed and submitted it anyway. She also testified that Danny Glass’s secretary told her that she “would have to pay back all that money” she had received if she “didn’t fill out the box no on those accident and sickness status forms.” Dwight Dixon, a Firestone sealing-tape manager and Hopson’s supervisor, testified that he could not recall anyone else tripping or falling at the ramp as Hopson had done. He described her falls in the first-aid room and parking lot, which he witnessed, as slow-motion falls onto her backside that did not seem real, and he said that her knees did not impact anything. Bruce Yelverton testified that Hop-son’s blood pressure in the first-aid office was 180/90 and that she told him she was out of her medication and had recently taken relatively strong pain medicine. He described her fall when she stood to go to the bathroom as a slow-motion collapse onto her buttocks, rolling to the right side, with no visible knee impact. He described the fall when she attempted to leave for the parking lot — while he supported her on the right — as a collapse to the left in which she slid down the wall and he attempted to pin her against it, but she landed on her buttocks. Hopson testified on rebuttal testimony that the | Rtwo men’s descriptions of her falls were unfair, particularly of Yelverton’s holding her against the wall. She said, “I went down, bam. He couldn’t even hold me and it wasn’t no catching, I went down. I landed on my knees.” A radiology report correlated October 18, 2010 x-rays of Hopson’s knees with her bilateral MRIs of October 20, 2010: Complete tear of [right-knee] distal quadriceps tendon near the musculotendi-nous junction with inferior positioning of the patella and serpiginous folding of the quadriceps tendon in the suprapatellar space associated with a small calcification on radiograph which may be within the tendon. Left knee MRI of the same day also shows a distal quadriceps tendon tear, and bilateral tears are often associated with systemic disease including hyperparathyroidism, chronic renal failure, diabetes, rheumatoid arthritis, gout, or with history of steroid use/injections. On January 7, 2011, Dr. Johannes Gru-enwald surgically repaired quadriceps tendons in Hopson’s knees. He wrote in a September 27, 2011 letter that she “sustained work related injuries to her bilateral lower-extremity injuries as a result of a fall” and that the injuries — “disruption of the bilateral extensor mechanism to the lower extremity consisting of quadriceps tears” — were ultimately treated with open repairs. The letter continues: Please note that during the repair ... there was no indication of a chronic tear, we clearly found fresh tears to her bilateral lower extremities which were consistent with the history provided by Ms. Hopson. Unfortunately, Ms. Hopson was unable to complete her physical therapy; we firmly believe that physical [sic] would be beneficial even at this late stage to maximize her best possible outcome. There is no indication that arthritic joint pain and acute quadriceps tears have any positive connection. At this time, we believe that Ms. Hopson has reached maximum medical improvement. Applying the AMA Guides to the Evaluation of Permanent Impairment (4th ed.), Dr. Gruenwald assigned disability ratings of thirty-five percent for the right lower extremity and |7thirty-two percent for the left lower extremity. Firestone contends that substantial evidence does not support the decision that Hopson sustained a compensable injury. Firestone argues that Hopson had preexisting conditions in her knees that led to her knee problems in the workplace, and that the initial incident was an idiopathic fall caused by not taking her blood-pressure medication and by taking hydroco-done. Firestone complains that there were inconsistencies in Dr. Gruenwald’s deposition testimony and letter of September 2011 concerning Hopson’s impairment ratings and chronic versus fresh bilateral quadriceps-tendon tears, and that he incorrectly reported the mechanics of Hopson’s fall by stating that she fell forward and hit both kneecaps at once. Firestone complains that Hopson gave varied versions of her three falls; that in seeking medical treatment, she repeatedly stated that this was not a workers’ compensation incident; that she refused to be tested for a possible systematic disease despite four doctors’ concerns; and that on accident-and-sick forms, in order to receive her short-term disability, she answered “no” to the question of whether the injury was due to employment. Firestone concludes that the injury did not arise out of Hopson’s employment but was personal to her. The Commission, adopting and affirming the decision of the law judge, rejected these arguments: Even if the claimant had preexisting conditions, a finding which I do not make, the claimant’s falls on September 22, 2010, aggravated any alleged preexisting condition thereby creating compensable injuries in and of themselves .... [NJothing in the record reflects that the claimant ever had a history of fainting or falling due to either preexisting conditions, lack of blood pressure medication, or for taking pain medication. To buy into the respondents’ argument of an idiopathic fall would be to engage in speculation and conjecture.... |sThe compensability of Hopson’s injury turned on credibility determinations and resolution of testimony. There was substantial evidence from which the Commission could have found that Hopson’s falls were work-related; did not result from preexisting conditions, pain medication or lack of blood-pressure medication; and were not idiopathic falls. II. Impairment Rating Any determination of the existence or extent of physical impairment must be supported by objective and measurable findings. Ark.Code Ann. § 11 — 9— 704(c)(1)(B) (Repl.2012). The Commission has adopted the American Medical Association Guides to the Evaluation of Permanent Impairment (4th ed.1993) to be used in the assessment of anatomical impairment. Avaya v. Bryant, 82 Ark.App. 273, 105 S.W.3d 811; see Ark.Code Ann. § 11-9-522(g)(l)(A) (Repl.2012). Under Arkansas Code Annotated section 11 — 9— 102(4)(F)(ii) (Repl.2012): (a) Permanent benefits shall be awarded only upon a determination that the com-pensable injury was the major cause of the disability or impairment. (b) If any compensable injury combines with a preexisting disease or condition or the natural process of aging to cause or prolong disability or a need for treatment, permanent benefits shall be payable for the resultant condition only if the compensable injury is the major cause of the permanent disability or need for treatment. The major-cause requirement is satisfied where a compensable injury aggravates an asymptomatic preexisting condition such that the condition becomes symptomatic and requires treatment. Wright v. St. Vincent Doctors Hosp. Indem. Ins. Co. of N. Am., 2012 Ark. App. 153, 390 S.W.3d 779. Firestone argues that Hopson failed to prove that the major cause of her disability or | gimpairment was her workplace fall as opposed to systemic disease or other preexisting condition and that she refused to be tested for diseases that could have caused her injury. It also argues that Dr. Gruenwald’s medical opinion of impairment is theoretical because he admitted the reference in his letter to “fresh tears” should have been “chronic” and was based on Hopson’s subjective history of how the injury occurred. It complains that Dr. Gruenwald “loosely” referenced the AMA Guidelines and testified that he could not rule out systemic disease. The Commission is authorized to decide which portions of the medical evidence to credit and to translate this evidence into a finding of permanent impairment using the AMA Guides; thus, the Commission may assess its own impairment rating rather than rely solely on its determination of the validity of ratings assigned by physicians. Id. The Guides are just that: mere guides to aid the Commission in assessing the degree of a claimant’s disability as defined by statute and interpreted by the courts. Singleton v. City of Pine Bluff, 102 Ark.App. 805, 285 S.W.3d 258 (2008). In Wayne Smith Trucking, Inc. v. McWilliams, 2011 Ark. App. 414, 384 S.W.3d 561, we noted our holding in Wal-Mart Assocs., Inc. v. Ealey, 2009 Ark. App. 680, 2009 WL 4654630 that in addressing an impairment rating, there is no requirement that medical testimony be based solely or expressly on objective findings, only that the medical evidence of the injury and impairment be supported by objective findings. Here, MRIs of Hopson’s left and right knees showed bilateral quadriceps tendon tears. Dr. Gruenwald, after surgically repairing the tears, wrote in his September 27, 2011 letter: “According to Fourth Edition, AMA Guidelines this impairment rating is based on limitations | inas a result of her work-related injuries. Ms. Hopson has disability rating for the right lower extremity of 35% and 32% to the left lower extremity.” The Commission found the ratings in accord with the AMA Guidelines, accepted the ratings, and found that Hopson had proved her compensable bilateral knee injuries to be the major cause of impairment. On this basis, the Commission awarded the impairment ratings that Dr. Gruenwald had assigned. The Commission exercised its duty to assess the medical evidence to make a finding of permanent impairment, using the opinion of Dr. Gruenwald and guidance of the AMA Guide to assess the degree of disability. Substantial evidence thus supports the Commission’s decision on this issue, and we affirm. III. Medical Treatment Arkansas Code Annotated section 11-9-508(a) (Repl.2012) requires an employer to promptly provide an injured worker such medical and surgical treatment “as may be reasonably necessary in connection with the injury received by the employee.” What constitutes reasonably necessary treatment is a question of fact for the Commission, which has the duty to use its expertise to determine the soundness of medical evidence and to translate it into findings of fact. Hamilton v. Gregory Trucking, 90 Ark.App. 248, 205 S.W.3d 181 (2005). Firestone argues that the basis of Dr. Gruenwald’s opinion that the surgery was related to falls at work was inaccurate. It also argues that there is no evidence showing that expenses for Hopson’s “incurred and recommended medical treatments” were for a compensable injury as opposed to a preexisting condition, calcification from a prior infection, misuse of | n medications, or a systemic disease. The Commission rejected these arguments when deciding the issue of compensability, and it necessarily follows that the arguments fail to support Firestone’s challenge to medical treatment for the compensable injury. Affirmed. PITTMAN, VAUGHT, and WOOD, JJ„ agree. WALMSLEY and HIXSON, JJ., dissent. . The Commission’s decision states that Jak-eeli Bennett was Dr. Fox’s nurse practitioner.