SLIP OPINION

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV–16–103

| | |
|---|---|
| EMERGENCY AMBULANCE SERVICES<br><br>APPELLANT<br><br>V.<br><br><br>DAVID PRITCHARD<br>APPELLEE | **Opinion Delivered** August 31, 2016<br><br>APPEAL FROM THE ARKANSAS WORKERS' COMPENSATION COMMISSION<br>[NO. G403416]<br><br><br><br>AFFIRMED |

## RITA W. GRUBER, Judge

Emergency Ambulance Services brings this appeal from the decision of the Arkansas Workers' Compensation Commission (Commission) that awarded a forty percent permanent impairment rating to David Pritchard, a paramedic supervisor for appellant. Appellant challenges the sufficiency of the evidence to support the award, arguing that the Commission ignored pertinent case law and improperly relied on an impairment rating that was based on subjective complaints and testing. We affirm.

An injured employee is entitled to compensation for the permanent functional or anatomical loss of use of the body as a whole whether his earning capacity is diminished or not. *Wayne Smith Trucking, Inc. v. McWilliams*, 2011 Ark. App. 414, at 13, 384 S.W.3d 561, 568. "Permanent impairment" is "any permanent functional or anatomical loss remaining after the healing period has ended." *Thompson v. Mountain Home Good Samaritan Vill.*, 2014 Ark. App. 493, at 8, 442 S.W.3d 873, 879. Under Arkansas Code Annotated § 11-9-

102(4)(F)(ii) (Repl. 2012),

(*a*) Permanent benefits shall be awarded only upon a determination that the compensable injury was the major cause of the disability or impairment.

(*b*) If any compensable injury combines with a preexisting disease or condition or the natural process of aging to cause or prolong disability or a need for treatment, permanent benefits shall be payable for the resultant condition only if the compensable injury is the major cause of the permanent disability or need for treatment.

Mr. Pritchard suffered a compensable injury to his right wrist on April 15, 2014, while performing chest compressions on a patient being transported to a hospital. The ambulance driver slammed on the brakes, causing Mr. Pritchard's right hand and arm to become trapped and twisted by a strap securing the patient to the gurney. Mr. Pritchard received medical treatment in the hospital's emergency room and was seen by orthopedic surgeon Dr. Richard Wirges on April 29, 2014. Dr. Wirges observed that Mr. Pritchard was right-hand dominant and presented with "a lot of pain and swelling." Dr. Wirges dictated the following notes:

> He felt pops immediately on the radial and ulnar side of his wrist. He was treated conservatively at first . . . . Unfortunately, he just has not gotten any better. He had an MRI that showed he has radiocarpal arthritis with also some arthritic changes consistent with possible ulnar abutment syndrome on the ulnar side and some cystic changes in the bone but no obvious tears of any structure. At this point though his hand is very painful and very sore. He has swelling. He has stiffness. It is already going into his fingers. He does occasionally have a little bit of numbness and tingling, although it is minimal. He states that when the injury first happened, immediately his thumb went numb. That has improved a little bit. Occasionally he has a little burning electricity but not much. It is mostly a throbbing pain. . . . No signs of compartment syndrome. There are soft tissue changes that are different from the contralateral side. It is very sensitive even to light touch. X-rays do show a little bit of osteopenic changes. He does have the radiocarpal arthritis and I wonder if this is not from possibly an old scapholuntate interosseous ligament tear, but there is no major DISI deformity on the lateral film. He also has a little bit of ulnar positive variation that would be consistent with the possible ulnar abutment syndrome. . . . [H]e had no symptoms prior to the injury though. Now he has symptoms and clinically the patient is concerning [sic] not only for all of these soft tissue changes but also for the possibility

of RSD/chronic regional pain syndrome.

After diagnosing "right-wrist blunt trauma with soft tissue musculoskeletal symptoms as well as neurologic concern for reflex sympathetic dystrophy/chronic regional pain syndrome," Dr. Wirges ordered an MR arthrogram and a three-phase bone scan.

Dr. Wirges noted at a May 6, 2014 return visit that the bone scan and arthrogram showed inflammatory changes. The arthrogram showed a torn "lunotriquetral ligament [and] TFCC with concern for widening of the DRUJ,[1]" along with "a lot of soft tissue ligament tears and contrast going into the midcarpal joint as well as the DRUJ." It also showed a partial tear with severe tendonosis of the ECU tendon and marked synovial thickening with "some chronic arthritic change there that definitely would have been made worse because of this injury and now looks more significant with inflammation." Dr. Wirges stated that although the bone scan did not show a "classic picture" for RSD, there was a very high risk for it. He noted that some symptoms remained, but immobilization, Neurontin, and vitamin C had helped; that the hand looked better and the swelling had improved; that pain was still an issue but improving; and that Mr. Pritchard had done everything he had been asked to do. Dr. Wirges planned surgical exploration and stabilization in the form of possible ligament repairs, salvage procedures, or reconstruction. Again noting that Mr. Pritchard previously had been without pain or symptoms in the wrist, Dr. Wirges stated "all this" was directly related to Mr. Pritchard's injury, that he was still at risk for RSD, and that close monitoring was required.

---

[1]Elsewhere, the medical record defines DRUJ as distal radioulnar joint.

Dr. Wirges wrote in a May 11, 2014 letter that Mr. Pritchard's "last chart note as well as reports from his MRI and CT scan findings" showed "several injuries in his wrists" [sic]. Dr. Wirges stated that there were "several injuries to that wrist that need to be repaired, . . . subluxation of his carpal bones, and . . . this is something that is absolutely related to the injury and without repair will absolutely deteriorate and cause him more problems in the future." Dr. Wirges added that he was "baffled" that coverage was being denied, and he opined that approval should be given "sooner rather than later . . . in the best interests of the patient and his outcome."

Surgery was ultimately approved and was performed on June 10, 2014. Surgical notes describe the procedure as right wrist exploration with partial wrist denervation, excision of the posterior interosseous nerve; right wrist synovectomy; right distal radioulnar joint reconstruction using free tendon graft; harvest of free tendon graft from partial thickness of the flexor carpi radialis tendon, ipsilateral arm; right lunotriquetral ligament repair; and right lunotriquetral fusion with hardware. A week later, Dr. Wirges's clinic note reflects that swelling was present and that, although not approved by workers' compensation, Mr. Pritchard was taking vitamin C for prevention of RSD, a development that would be "devastating." Swelling, range of motion, hypersensitivities, color, and pain levels had improved at two weeks. Swelling, motion, and overall appearance had improved at three months; Mr. Pritchard could grasp a mustard bottle; his motion and strength were limited; strengthening exercises could be started; and pain, although improved, remained unresolved. Fusion never occurred. At four months, Dr. Wirges wrote that after "right wrist DRUJ

4

SLIP OPINION

reconstruction with . . . lunotriquetral ligament repair and a screw placed . . . for an attempted fusion," the patient was "neurovascular grossly intact with the exception of numbness in the median nerve distribution area"—which was waking him at night.

On December 16, 2014, six months after surgery, Dr. Wirges wrote that Mr. Pritchard had "plateaued in his improvements," was at maximum medical improvement (MMI), and did not want additional surgical treatment despite the risk for arthritis from posttraumatic changes and the possible need for "additional treatment in the future." On December 19, 2014, Dr. Wirges assigned the permanent impairment rating as follows:

> Based on the American Medical Association guides to the evaluation of permanent impairment fourth edition, this is his impairment rating: Due to sensation loss of the right thumb, index finger, and long finger, the patient has a 36% hand impairment. Due to the loss of motion of his wrists, he has an 8% upper extremity impairment. Using table 2 on page 3119, we see a 36% hand impairment is equal to a 32% upper extremity impairment. This is then added to the a percent [sic] upper extremity impairment from loss of motion of his wrists giving him a total of 40% right upper extremity impairment. Table 3 on page 3120 shows a 40% upper extremity impairment is equal to a 24% whole person impairment.

Mr. Pritchard, who was fifty-three years old at the time of the hearing before the administrative law judge, testified about the delay in approval for surgery and about subsequent concern for RSD and ongoing problems with his wrist and arm. He testified that his medications included one for pain. He said that he had participated in fifteen weeks of extensive physical therapy, received an injection in his wrist, and returned to work in patient transport wearing a compression wrap while "on the truck." He said that he still wore a splint at night, the swelling had never gone down despite "steroids and everything else," there were recent problems with his arm, and there were many things he could not do:

> I cannot do chest compressions like I used to because of a lack of mobility in my hand. There is very little side-to-side range of motion and I have trouble putting in IVs because three of my fingers are numb. My index finger and little finger are numb. I have to use my left hand to administer IVs now. I have a different way of lifting than I used to and I have trouble making a curling motion. I have thumb, index finger and middle finger numbness. I have . . . a pain that will not go away.

He testified that the swelling lasted throughout the day, slowing down computer work he did in the truck; that his right-hand grip strength had been affected; and that things would sometimes "just drop" when he was carrying them.

Mr. Pritchard testified that Dr. Wirges had recommended another surgery but had said it could result in a loss of all sensation in the hand. Mr. Pritchard described the "physical and range-of-motion testing" of his wrist and arm that Dr. Wirges performed at the final office visit in November 2014:

> He did sensations, both forward and side-to side. He also did rotation. The doctor had his hands on me and conducted those tests. When he did it, he would push to the point of pain and then he tried to push a little more. He wanted to see how much I had lost.

> . . . .

> Dr. Wirges actually twisted my wrist when he checked my range of motion and went as far as he could and that is how he came up with that. The other part of this rating that we have is due to loss of sensation. The doctor took pins and stuck my finger. The test is called the two point discrimination test. When he would stick a pin in my finger, I had to tell him if I felt it or did not feel it. I kept telling him to stick harder because I cannot feel it. The only place that I could feel was up on this finger here. This side, I cannot feel. On these two, I cannot feel anything. He said the reason for that was because he had to go in there and work on all this here. I just ripped it all to pieces. I am talking about the inside part of my wrist.

> The instrument used was a two pronged thing. He stuck it in my palm. He stuck it up beside my hand. He stuck it up in my fingers, all of it. He stuck it all. I was not looking at where he was sticking. I had my head turned and my hand out. I would then respond and that is how he knew whether I had this loss of sensation or not. My

ring and little fingers are good. My long and index fingers are not good. And the thumb is not good. That is what the doctor is saying. He said that he can go back in there and do more surgery and maybe I could get the sensation back. He said that I could lose all of it. I cannot lose all of it because I have been through enough already and I said that I was not doing it anymore.

In her written decision, the law judge addressed appellant's argument that the forty-

percent impairment rating assigned by Dr. Wirges was invalid:

> The respondents argue that the rating is based on the claimant's subjective complaints[;] however, Dr. Wirges found swelling and discoloration in his reports in addition to the failed fusion. As I interpret the rating, the pin prick test results reflect the "partial wrist denervation" mentioned in the surgical report, and correspond with the median nerve distribution. Therefore, I find the claimant's loss of sensation is an objective medical finding worthy of a permanent impairment rating.
>
> The respondents also argue that range of motion is subjective testing. However, the Court has distinguished between active and passive testing and has determined that passive testing, conducted by the examiner, may be taken into consideration when assessing impairment, *Wilson v. Smurfit Stone Container*, 2009 Ark. App. 800, and *Mooney v. AT&T*, 2010 Ark. App. 600. Since the claimant testified the doctor manipulated his hand during the examination, I find that a passive test was conducted, which is an objective medical finding worthy of a permanent impairment rating.

The law judge found that Mr. Pritchard had proved by a preponderance of the evidence that

"he sustained permanent impairment of forty percent (40%) to his hand, wrist and forearm

supported by objective medical findings." Additionally, she found that the compensable

injury was the major cause of impairment. The Commission affirmed and adopted her

decision.

Appellant argues that the present case is completely analogous to *Burks v. RIC, Inc.*,

2010 Ark. App. 862, in which Burks challenged the Commission's finding that two-point

discrimination testing for loss of sensation did not constitute objective physical findings to

support his claim for additional anatomical impairment.[2]  The Commission assigned little weight to the doctor's report and found that the test was based entirely on the claimant's ability to determine touch stimuli.  We held that the evidence supported the Commission's decision to deny the claim:

> By Burks's own testimony, he had to tell the doctor when he felt the stimuli.  *There was no other independent means to confirm Burks's statements.*  Although the two-point discrimination is "the most value" for determining sensory loss under the AMA Guidelines, not everything under the Guidelines is admissible under the statute.  Test results that are based upon the patient's description of the sensations produced by various stimuli are clearly under the voluntary control of the patient and therefore, by statutory definition, do not constitute objective findings.

*Burks*, 2010 Ark. App. 862, at 4 (footnote omitted; emphasis added).

A determination of the existence or extent of physical impairment shall be supported by objective and measurable physical or mental findings.  Ark. Code Ann. § 11-9-704(c)(1)(B) (Repl. 2012).  Active range-of-motion tests, being entirely within the voluntary control of the patient, are subjective in nature; passive range-of-motion tests, however, are conducted by the examiner and therefore can constitute objective evidence of mechanical defect.  *Wilson v. Smurfit Stone Container*, 2009 Ark. App. 800, at 11, 373 S.W.3d 347, 353.  Although our legislature has required that a compensable injury be established by medical evidence supported by objective findings, such evidence is not required to establish each and every element of compensability.  *Singleton v. City of Pine Bluff*, 97 Ark. App. 59, 60, 244 S.W.3d 709, 711 (2006) (citing *Stephens Truck Lines v. Millican*, 58 Ark. App. 275, 950 S.W.2d 472

---

[2]RIC paid permanent impairment ratings for a thumb and fingers after reattachment surgery, but it controverted an additional thirty percent anatomical impairment for loss of sensation in the thumb.

(1997)). "All that is required is that the medical evidence of the injury and impairment be supported by objective findings, Ark. Code Ann. §§ 11-9-102(4)(D) and 11-9-704(c)(1)(B) (Repl. 2002), i. e., findings that cannot come under the voluntary control of the patient. Ark. Code Ann. § 11-9-102(16)(A)(i)." *Singleton*, 97 Ark. App. at 60, 244 S.W.3d at 711.

Here, appellant presents various reasons that we must reverse the Commission's decision to award a forty percent permanent impairment rating: Dr. Wirges was listening to Mr. Pritchard's subjective complaints; sensation is, by definition, subjective; the examiner must rely on the patient's truthfulness; Dr. Wirges rated the upper extremity instead of the arm below the elbow; and, because Dr. Wirges referred to both wrists in the impairment rating, "it must be assumed" that he took both wrists into account. Appellant posits that no medical evidence corroborates Mr. Pritchard's testimony that the doctor manipulated his hand in such a way as to constitute a passive range-of-motion test.

The Commission, although authorized to decide which portions of the medical evidence to credit and to translate the evidence into a finding of permanent impairment using the American Medical Association Guides, may assess its own impairment rating rather than rely solely on its determination of the validity of ratings assigned by physicians. *Firestone Bldg. Prods. v. Hopson*, 2013 Ark. App. 618, 430 S.W.3d 162. Furthermore, there is no requirement that medical testimony be based solely or expressly on objective findings—only that medical evidence of the injury and impairment be supported by objective findings. 2013 Ark. App. 618, at 9, 430 S.W.3d at 168.

In the present case, as in *Burks*, we must decide if substantial evidence supports the

Commission's decision. The weight and interpretation of the medical evidence, on which this decision turned, were matters for the Commission. *Pyle v. Woodfield, Inc.*, 2009 Ark. App. 251, 306 S.W.3d 455. Any discrepencies in the medical evidence or other evidence, as well as the credibility of witnesses, were also for the Commission to decide. It is within the Commission's province to reconcile conflicting evidence, including the medical evidence, and to determine the true facts. *Hernandez v. Wal-Mart Assocs., Inc.*, 2009 Ark. App. 531, at 2, 337 S.W.3d 531, 532.

Noting medical reports of swelling, discoloration, and the failed fusion itself, the Commission interpreted the pin-prick test results to reflect the "partial wrist denervation" mentioned in the surgical report. The Commission then concluded that the rating corresponded with the median nerve distribution. Implicit in the Commission's decision was a finding that the claimant credibly testified that the doctor had manipulated his hand during the examination. Applying the proper standard of review, we hold that there is substantial evidence to uphold the findings and conclusion of the Commission.

Affirmed.

ABRAMSON and VIRDEN, JJ., agree.

*Michael E. Ryburn*, for appellants.

*Gary Davis*, for appellee.