Brandon J. Harrison, Judge, dissenting. This accident was horrific. [The utility truck with a boom lift known as] the Devil Unit didn’t just flip over, it actually body slammed him down. [I] went around to [Rick] and held him in my arms until-he was trying to breathe and I called 911, and told them we had somebody down. He was just kind of focusing on being able to breathe and I was focusing on making sure that he knew I was there and that he wasn’t alone[.] I was concerned whether Rick was going to survive. He is my friend. I was relieved when I got to Rick and he was breathing. —Kevin McDonald, coworker and eyewitness ‡ ⅜ ⅜ The first surgery I had was my face. They tried to put the bones back together. I’ve got screws and plates where they couldn’t get the bone in and they went in through my eye and my nose and my mouth to do just the face. The next surgery was eye surgery. They tried to bring my eye out and correct it. It was pushed back approximately an inch and a half. They were not able to get it completely aligned. —Rick Yousey, injured worker H* ⅝ I also noted post-traumatic encephalopathy. Encephalo is brain; pathy is something wrong. Something is wrong with his brain. There’s a lot of evidence in front of us that he does have a brain injury. He didn’t just hit his head. He had a severe skull fracture. This is the worst thing I’ve ever seen [in approximately 40 years]. He’s lucky to be alive. —Dr. Michael W. Morse, treating neurologist (board certified) [[Image here]] [Rick] has misalignment of the two eyes. That’s a result of the fractures of his face from this injury. He did have some surgery to try and align the eyes. From what I understand, one of the key things they were looking at was to reposition the eye because it was sunken. They were able to improve the position of the eye, but they | 1swere not able to correct the alignment. I suspect there is also some permanent damage to tissue as a result of these traumatic injuries. —Dr. Andrew Lawton, ophthalmologist/neuro-ophthalmologist * * * Gallagher Bassett referred Mr. Yousey to me. I guess [it] wanted an assessment of how much cognitive impairment or dysfunction there was secondary to the head injury. Dr. Morse (Rick’s neurologist) recommended a neuropsychological evaluation. I gave [Rick] a bunch of tests. It’s the regular battery of neuropsychological tests that are administered. One was an intelligence test and then there’s motor speed tests and visual perception tests and there’s time tests. All of these have been selected over the years in terms of how sensitive they are to brain dysfunction, so there’s about 12 tests I gave him. In laymen’s terms, my diagnosis of Mr. Yousey is dementia, which has a negative connotation like Alzheimer’s, but dementia also means brain dysfunction from whatever source, and then the diagnosis-the source is head injury. At some point in time I gave Mr. Yousey a permanent impairment. —Dr. Richard Back, treating clinical neuropsychologist ⅜ ⅝ ⅜ sfc # I’ll quickly remind both the majority and my concurring colleague that the existence and extent of a permanent impairment must be supported by “objective and measurable physical or mental findings.” Ark. Code Ann. § 11-9-704(c)(1)(B) (Repl. 2012) (Emphasis added). We have both in this case. On this point, this court has warned that “there is no requirement that medical testimony be based solely or expressly on objective findings—only that medical evidence of the injury and impairment be supported by objective findings.” Emergency Ambulance Serv. v. Pritchard, 2016 Ark. App. 366, at 8, 498 S.W.3d 774, 780 (internal citations omitted). The objective-findings bar has been raised too high today, and unnecessarily so. This court has, for more than three decades, admonished that the Commission, not us, credits and weighs the evidence, including doctors’ opinions. Hunter Wasson Pulpwood v. Banks, 270 Ark. 404, 606 S.W.2d 753 (1980); Black v. Riverside Furniture, Co., 6 Ark. App. 370, 642 S.W.2d 338 (1982). By law we are tasked to decide one ultimate question: was the Commission’s decision a reasonable one? The Commission’s 60-page opinion in this case cleared all the legal hurdles. So I would affirm its decision to award Mr. Yousey a modest permanent-impairment rating of 29% to the body as a whole. I appreciate, and agree with, the concurring judge’s concern about judicial lawmaking. But I’m not advocating for the judicial “liberalization” of workers’-compensation law. I’m not rewriting a statute. Contrary to the letter and spirit of the concurrence, no legislative solution is needed; what’s needed is for this court to more circumspectly apply the objective-findings requirement. Here, a fidelity to our standard of review and a straightforward application of the current statute to the facts require us to affirm the Commission. This case is that simple. Just as relieved as coworker Kevin McDonald was to find Rick breathing after he saw the Devil Unit body slam him to the ground more or less face first, and just as sure as neurologist Dr. Morse was that Mr. Yousey is “lucky to be alive” given “a severe skull U ¿fracture,” I’m as confident that the Commission justifiably awarded the modest permanent-impairment rating. The stubborn facts make the case. Dr. Andrew Lawton (ophthalmologist/neu-ro-ophthalmologist) Dr. Lawton saw Mr. Yousey twice. We learned from this medical doctor that Mr. Yousey’s left eye orbital bones suffered a “blow out” fracture and that the force of the impact injury pushed his eye back into his head and otherwise misaligned it. All this caused his patient significant and lingering vision problems that we need not dwell on further here. Dr. Scott Bolding, DDS MS (performed a bone-graft from hip to jaw for dental implants) In March 2013, Dr. Bolding reported this regarding his consultation with Mr. Yousey on the need for dental implants: Patient was involved in a traumatic work injury at work on February 24, 2012. Patient was unloading a piece of steel equipment from the back of a truck when the equipment fell on him and patient struck the ground forcefully with his face. Patient had reconstructive face surgery ... to repair fractures in maxilla [upper jaw] and around left orbit [eye]. Patient also had to have surgery on his left hand and left rotator cuff[.] Patient has been edentulous [without teeth] most of his adult life, but is no longer able to wear dentures due to facial trauma and traumatic atrophy to the maxilla [upper jaw]. Dr. Richard Back (clinical neuropsychologist) Dr. Back’s interview, testing, and testimony established the following facts: • Dr. Back diagnosed Mr. Yousey with having dementia, at age 53. • Dementia is a “brain dysfunction,” and the doctor answered “yes” when asked whether “this dementia or brain dysfunction resulted from the incident at work.” • Mr. Yousey had “innumerable fractures” in his head and face. |16* The neuropsychological test results were consistent with a traumatic brain injury, which Rick sustained. The results were consistent with an acceleration/deeeleration injury that his head and brain would have received. • Mr. Yousey’s head injuries were consistent with having experienced a shearing force. • Dr. Back explained that shearing is what happens when your head is quickly rotated, jerked, or twisted, even if it’s just “a fourth of an inch.” The sudden movement disrupts the brain cells. Even if there is not enough “separation” to show up on an MRI scan, the force still “disrupts the chemical and electrical and circuits.” • When asked: “In your opinion, is the shearing that showed up on the MRI an objective finding beyond Mr. Yous-ey’s control?” Dr. Back said: “Yes.” • Depression, anxiety, irritability, fatigue, and diminished interest were problems reported by treating physician Dr. Anne-Marie Magre, M.D. Symptoms associated with posttrau-matic stress disorder (PTSD) appeared too. • When tested after the accident, Mr. Yousey showed the mental functioning of a 12 year old, a rating far below that which holders of commercial driver licenses rate in general. Until the accident, Rick held a CDL. • Dr. Back reported that Mr. Yousey functioned in the borderline range of mental retardation when he was tested after the accident. • “[T]he prognosis on significant head injuries is pretty guarded in terms of anybody going—getting back to what their [preinjury] level of functioning was.” By the way, why are claimants like Mr. Yousey even seen by clinical psychologists like Dr. Back—and at the employer insurer’s request in this case—if their professional opinions mean nothing under workers’-compensation laws? Why the waste of time and money and effort of the doctors and injured workers? And who are we judges to ignore a trained health-care professional’s rigorous testing methods and opinions? Dr. Back has been practicing since |171980 and has given “over 1,000” neuropsychology tests like the ones Mr. Yousey took. Dr. Back agreed when asked that “[a]fter doing over 1,000 of these, I have an idea if somebody is trying to be accurate with the testing[.]” I take the concurring judge’s observation that “brain-injury law has not kept up with brain-injury science” to make a similar point. To put it more bluntly, not one shred of evidence suggests that Rick Yous-ey is a faker, malingerer, or master test manipulator who sought to game the system and unjustly benefit from his employer. Dr. Michael W. Morse (board-certified neurologist) Dr. Morse, a medical doctor specializing in the anatomy and physiology of the human nervous system, said that an MRI scan of Mr. Yousey’s brain wouldn’t allow him to state with “a hundred percent” certainty that he suffered a shear injury; but the film did not rule it out. The scan did tell Dr. Morse that the work accident caused Mr. Yousey’s left eye to be “pushed back.” He agreed that broken bones in Mr. Yousey’s face and the displaced eye were objective findings. The July 2012 MRI scan—which was performed almost five months after the February crush injury had occurred— couldn’t even tell the whole story if it wanted to. Setting aside the nearly 150-day delay and what it may or may not have meant diagnostically, the July scan’s ability to detect bleeding in Mr. Yousey’s brain was admittedly absent for a more fundamental reason. Dr. Morse said that the scan was essentially normal, but that opinion was qualified on a key point: “They did not do a specific sequence looking for blood, so there’s 11sa very sensitive way you can look for brain damage from bleeding. That was not done on this particular scan. ... I said there’s no evidence of hemorrhage, but again, the most sensitive test for hemorrhage was not performed.” (Emphasis added). Neither the majority nor the concurring opinions shine light on this scientific fact. What they have implicitly required is that a five-month old diagnostic image show them a brain bleed although the test given was not even sensitive enough to detect a bleed had one occurred. That’s unreasonable. Dr. Morse didn’t just look at film. He treated Rick. Laid hands on him. Judged him as highly trained medical professionals are taught to do. Even stuck needles into the back of Rick’s head on multiple occasions to partially and temporarily relieve him of chronic headaches he has suffered since 2012—a “last resort for most people,” in the doctor’s words. The neurologist also said, Something is wrong with his brain. ... There’s a lot of evidence in front of us that he does have a brain injury. He didn’t just hit his head. He had a severe skull fracture. This is the worst thing I’ve ever seen [in approximately 40 years]. He’s lucky to be alive. Pause and let this core opinion echo: “Something is wrong with his brain. ... There’s a lot of evidence in front of us that he does have a brain injury.” If more is required from Dr. Morse, we have it. The base of your skull, the bottom of your skull right above your eyes is real rough, so when you have a head injury, your brain swirls around and is rubbed up against those rough surfaces and some bruising at the very bottom of your brain and the classic symptoms of that are loss of smell and taste (which Mr. Yousey suffers).... You can get personality changes from that. He had |1fla period of amnesia which indicated his head injury was significant. It wasn’t just his face. His brain was injured. The Commission accepted this opinion. Returning to the objective-findings point on which the majority and concurring opinions have run aground, Dr. Morse agreed with Dr. Back’s assessment that Mr. Yous-ey’s left hand seemed to be impaired, which suggested a right hemisphere dysfunction consistent with a brain injury. If a neurologist with decades of clinical experience agrees with an experienced psychologist’s battery of tests and the conclusions the psychologist makes from the tests, who are we to discount their opinions? Dr. Morse also saw photos of Mr. Youse/s condition after the accident and said that the diagnostic images contained objective findings that were consistent with a brain injury. A February 2012 CT scan of Rick’s face concluded this way, “Impression: Innumerable facial fractures bilaterally.” Again, Dr. Morse agreed that the CT scan was an objective finding. The majority’s decision doesn’t, of course, just affect Mr. Yousey. Future head-trauma victims will immediately find themselves in an out-of-touch legal landscape if they are badly injured while working. If it was hard for a claimant to establish a compensable brain injury before today, the majority’s abrupt shift in this case has created a nearly impossible burden for real-world people who face real-world dangers. Our decisions in the head/brain-injury context have not been entirely consistent, which I grant is a difficult task to achieve. But one thing is clear: the claimants’ injuries in the cases I have read don’t come close to Rick’s horror. | ^Consider one recent example of a brain-injury case, Myers v. City of Rockport, where this court affirmed the Commission’s finding that there was no com-pensable head injury—primarily because the car-wreck victim presented initially with a sore shoulder but no indication of a head injury and “there were no complaints regarding [the claimant’s] head or brain having been injured in the accident until more than two years following” the motor-vehicle accident. 2015 Ark. App. 710, at 9, 479 S.W.3d 33, 40.. The dissent in Myers was concerned that testimony about severe daily headaches, memory issues, personality changes and deficient verbal/auditory skills was overlooked. Here we tragically have it all: (1) a severe head-trauma/facial-disfigurement accident of a sort not even dreamed of in Myers, or in any other case I have read; and (2) evidence of many emotional and behavioral problems that the dissent in Myers rightly thought was important on the brain-injury question. Coworker McDonald said the accident was horrific and that he was concerned whether Rick was going to survive. In Dr. Morse’s judgment, while speaking on his patient’s difficulty swallowing after face- and jaw-reconstruction surgeries, Mr. Yousey experienced a traumatic crushed head. Thankfully the crush stopped (just shy) of killing him or placing him in a vegetative state. That’s the good news. The bad news is that Rick’s physical, behavioral, and emotional well-being was incontrovertibly and permanently changed for the worse immediately after a work accident involving his face, skull, eye, jaw, shoulder (rotator cuff), knee, hand, and foot. Yet this court |ainow denies him a benefit that the Commission saw fit to award on a deep factual and medical record. Given the majority’s choice—which upends our standard of review and creates a lopsided precedent—a worker must apparently suffer a head injury gruesome enough to attract a hungry horde of Zombies before he or she can prevail before the Commission and retain even a modest award on appeal. I dissent because, unlike my colleagues, I don’t believe the General Assembly would bless such a result for the men, women, and families it represents. Brown, J., joins.