

# ARKANSAS COURT OF APPEALS

DIVISIONS II & III
No. CV-16-565

| | |
|---|---|
| MULTI-CRAFT CONTRACTORS, INC. AND GALLAGHER BASSETT SERVICES, INC.<br><br>APPELLANTS<br><br>V.<br><br>RICK YOUSEY<br><br>APPELLEE | **Opinion Delivered** May 24, 2017<br><br>APPEAL FROM THE ARKANSAS WORKERS' COMPENSATION COMMISSION<br>[NO. G201671]<br><br>REVERSED IN PART AND AFFIRMED AS MODIFIED IN PART ON DIRECT APPEAL; AFFIRMED IN PART AND AFFIRMED AS MODIFIED IN PART ON CROSS-APPEAL<br><br>PETITION FOR REHEARING DENIED |

## N. MARK KLAPPENBACH, Judge

Appellee Rick Yousey was seriously injured in an accident while unloading equipment for his employer, appellant Multi-Craft Contractors, Inc. Yousey's injuries were accepted and medical treatment was provided, but Multi-Craft later controverted his claims for permanent disability benefits for his brain, loss of vision, and facial-nerve injury. The Workers' Compensation Commission (Commission) awarded Yousey benefits for impairments of his brain and left eye but found that he was not entitled to benefits for a nerve injury. On appeal, appellants contend that the impairment ratings for his brain and left eye are not supported by substantial evidence and that the Commission erred as a matter of law. Yousey has filed a cross-appeal challenging the Commission's findings regarding his left

SLIP OPINION

eye and facial-nerve injury.

As a result of his February 24, 2012 accident, Yousey suffered numerous facial fractures, including fractures of the cheekbones, nose, sinuses, jaw, and orbital bones, as well as a broken foot, broken hand, and torn rotator cuff. His neurologist, Dr. Michael Morse, testified that Yousey had the worst skull fracture he had ever seen and that he was lucky to be alive. Yousey had surgeries on his face and to realign his left eye, which had been pushed back into his head. He testified that he suffered from double vision and blurred vision since the accident, and as a result, he could no longer obtain a commercial driver's license. Yousey said that he takes prescription medication for headaches, which he suffers from every day, and resorts to getting painful shots in his head to treat the headaches when they become unbearable. Other symptoms he suffers from include loss of short-term memory, numbness and coldness in his left cheek, loss of his senses of taste and smell, slower speech, emotional lability, and depression.

Dr. Morse testified that Yousey's symptoms are consistent with a frontal-lobe brain injury. Dr. Morse referred Yousey to Richard Back, Ph.D., a clinical psychologist, for a neuropsychological evaluation. Dr. Back tested Yousey and found markedly impaired memory functioning and left-hand impairment in terms of fine and gross motor tasks. Yousey had improved somewhat when Dr. Back tested him again two years later. Dr. Back opined that Yousey's test results and all of his symptoms are consistent with the traumatic head injury he had sustained and assessed a permanent-impairment rating of twenty-nine

SLIP OPINION

percent to the body as a whole.

"Permanent impairment" has been defined as any permanent functional or anatomical loss remaining after the healing period has ended. *Wayne Smith Trucking, Inc. v. McWilliams*, 2011 Ark. App. 414, 384 S.W.3d 561. Any determination of the existence or extent of physical impairment shall be supported by objective and measurable physical or mental findings. Ark. Code Ann. § 11-9-704(c)(1)(B) (Repl. 2012). "Objective findings" are those findings which cannot come under the voluntary control of the patient. Ark. Code Ann. § 11-9-102(16)(A)(i). Medical opinions addressing compensability and permanent impairment must be stated within a reasonable degree of medical certainty. Ark. Code Ann. § 11-9-102(16)(B). However, there is no requirement that medical testimony be based solely or expressly on objective findings; the statute requires only that the medical evidence of the injury and impairment be supported by objective findings. *Wayne Smith Trucking, supra.*

An injured employee is entitled to compensation for the permanent functional or anatomical loss of use of the body as a whole whether his or her earning capacity is diminished or not. *Id.* The Commission is authorized to determine what portion of the medical evidence to credit and to translate that evidence into a finding of permanent impairment using the AMA *Guides to the Evaluation of Permanent Impairment*; the Commission may assess its own impairment rating rather than rely solely upon determination of the validity of ratings assigned by physicians. *Id.*

In reviewing decisions from the Commission, we view the evidence and all reasonable

SLIP OPINION

inferences deducible therefrom in the light most favorable to the Commission's decision and affirm if that decision is supported by substantial evidence. *Rippe v. Delbert Hooten Logging*, 100 Ark. App. 227, 266 S.W.3d 217 (2007). Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion. *Id*. Questions concerning the credibility of witnesses and the weight to be given their testimony are within the exclusive province of the Commission. *Id*.

The Commission found that Yousey was entitled to a permanent-anatomical-impairment rating of twenty-nine percent to the body as a whole for a brain injury. The Commission listed three objective findings to support its decision: (1) the extreme damage to Yousey's face and skull evidencing the traumatic forces applied to his brain; (2) the presence of pneumocephalus; and (3) the presence of evidence of a shear injury on an MRI. Appellants argue that none of these constitute objective findings to support an impairment due to a brain injury.

The Commission first concluded that the severity of the damage to Yousey's head was objective evidence of the great force applied to his head, skull, and brain. The Commission noted Dr. Back's testimony that the force it took to break the multitude of bones in Yousey's face was consistent with the type of force that would cause a brain injury. We agree with appellants that the force of the accident and resulting broken bones are not objective medical findings to support a brain injury. Although great force was inflicted in the accident, there was no evidence that the numerous fractures Yousey suffered indicated

SLIP OPINION

that he necessarily injured his brain as well.

The Commission next found that Yousey's CT scan showed pneumocephalus, which it said was "objective evidence of skull fracture, and a skull fracture must involve trauma to the brain." We agree with appellants that the Commission used conjecture to find that a skull fracture "must involve" trauma to the brain. Dr. Morse testified that pneumocephalus was air inside the skull as a result of the skull fracture. When asked what this meant regarding a brain injury, Dr. Morse said that "it means his skull fracture was pretty bad is all that means." There was no evidence that the presence of pneumocephalus was an objective finding of a brain injury.

Lastly, the Commission relied on evidence of a shear injury on an MRI. Dr. Morse testified that Yousey's MRI showed something in his left internal capsule, but he could not tell from the MRI if it was a cyst that he had been born with, a shear injury due to the head injury, or an old, small infarct from a prior stroke. Dr. Morse was asked if he could say it was more likely to be shearing when considering all of the evidence indicating that Yousey had sustained a brain injury, but Dr. Morse said he could not say that. The Commission found that it was more likely to be a shear injury because there was no other evidence that Yousey had ever suffered a stroke, and the accident was consistent with a shear injury. Appellants argue that the Commission used conjecture and speculation in reaching this conclusion. We agree. The evidence established only that Yousey's MRI showed a potential shear injury. Dr. Morse could not opine that it was more likely to be a shear injury than the other two

5

possibilities. We hold that this does not constitute an objective finding of a brain injury. Substantial evidence exists only if reasonable minds could have reached the same conclusion without resort to speculation or conjecture. *Serrano v. Westrim, Inc.*, 2011 Ark. App. 771, 387 S.W.3d 292. Conjecture and speculation, even if plausible, cannot take the place of proof. *Id.*

Our court has established that neuropsychological testing, without more, is not adequate to establish an organic brain injury by "objective findings." *Parson v. Ark. Methodist Hosp.*, 103 Ark. App. 178, 287 S.W.3d 645 (2008); *Rippe*, 100 Ark. App. 227, 266 S.W.3d 217. Although Yousey's fractures and pneumocephalus were objective findings, they supported an injury only to his skull or his head, not his brain. *See Parson*, *supra* (holding that the objective findings of a facial hematoma and contusions supported an injury only to appellant's head, not her brain). Dr. Morse testified that based on the technology that was available, there were no objective findings of an injury to Yousey's brain. We hold that the evidence cited by the Commission does not satisfy the statute's requirement for objective findings to support a brain injury. Therefore, we reverse the Commission's decision awarding Yousey permanent-impairment benefits for his brain.

The Commission found that Yousey was entitled to a permanent-impairment rating of twenty-four percent to the body as a whole for his loss of vision. The Commission adopted the reasoning and assessment of Dr. Andrew Lawton, an ophthalmologist with a speciality in neuro-ophthalmology. As a result of the many fractures in Yousey's face,

SLIP OPINION

including a left–orbital–blowout fracture, Yousey's left eye was downwardly displaced and sunken in. Despite surgery, his eyes remained misaligned, and he suffered from double vision. Dr. Lawton testified that the AMA guides provided three components for the measurement of visual impairment, and the third component encompassed double vision. If a person has double vision within the central ten to twenty degrees of vision, Dr. Lawton said that it is interpreted by the AMA rules as a total loss of vision in that eye. A person would have to cover that eye in order to function. Dr. Lawton said that Yousey has double vision even less than ten degrees away from center of vision. According to Dr. Lawton, Yousey is entitled to a rating for total loss of vision in one eye, which is a twenty-five percent impairment of the entire visual system and translates to a twenty-four percent impairment of the whole person. The Commission agreed.

Appellants argue that this finding is not supported by substantial evidence because Yousey's visual acuity and peripheral vision were not affected by his injury; he can still see out of his left eye. Alternatively, appellants argue that Yousey should not be awarded benefits to the body as a whole because his injury is a scheduled injury. Under the scheduled–injury statute, appellants argue that Yousey did not suffer total loss of vision. On cross–appeal, Yousey agrees that his eye injury is a scheduled injury and asserts that he is entitled to a rating for 100 percent loss of use of his left eye.

The test of whether an injury falls within the scheduled–injury category is primarily a question of law. *Fed. Compress & Warehouse Co. v. Risper*, 55 Ark. App. 300, 935 S.W.2d

SLIP OPINION

279 (1996). An eye injury and the resulting impairment, including double vision, fall under the scheduled permanent-injury category as set forth in Arkansas Code Annotated section 11-9-521. *See id.* This statute provides that an enucleated eye, in which there was useful vision, is a scheduled injury for which an employee shall receive weekly benefits in the amount of the permanent partial-disability rate attributable to the injury for 105 weeks. Ark. Code Ann. § 11-9-521(a)(14). Compensation for the permanent loss of eighty percent or more of the vision of an eye shall be the same as for the loss of an eye. Ark. Code Ann. § 11-9-521(c)(1).

We agree with the parties that Yousey's injury is a scheduled injury. Dr. Lawton's testimony provided substantial evidence to support the Commission's finding that Yousey was entitled to a rating for 100 percent loss of vision in his left eye; however, because an eye injury is a scheduled injury, the Commission erred in converting the rating to an impairment to the body as a whole. A claimant who sustains a scheduled injury is limited to the applicable allowances set forth in Arkansas Code Annotated section 11-9-521. *Fed. Compress & Warehouse Co.*, *supra*. We therefore affirm the Commission's finding of 100 percent impairment to Yousey's left eye but modify the award to reflect that it is a scheduled injury and is not converted to an impairment to the body as a whole.

On cross-appeal, Yousey argues that there is no substantial evidence to support the Commission's refusal to award a rating for his trigeminal nerve injury. The Commission found that Yousey was not entitled to a rating for this injury because the rating assessed by

SLIP OPINION

Dr. Morse was based on Yousey's level of pain. When determining physical or anatomical impairment, neither a physician, any other medical provider, an administrative law judge, the Workers' Compensation Commission, nor the courts may consider complaints of pain. Ark. Code Ann. § 11-9-102(16)(A)(ii)(a). In Dr. Morse's deposition, Yousey's counsel asked him if Yousey would be entitled to a rating for a trigeminal nerve injury based on Table 9 of page 145 of the AMA guides. Yousey's counsel noted that the table rated mild, moderate, and severe neuralgic pain, and Dr. Morse assigned a moderate rating based on the level of pain Yousey reported from his headaches.

Yousey relies on this court's opinion in *Wayne Smith Trucking, Inc.*, 2011 Ark. App. 414, 384 S.W.3d 561, for the proposition that damage to the trigeminal nerve is an accepted finding to support an impairment rating. The impairment rating affirmed in that case, however, was not based solely on complaints of pain. Here, when asked to assess a rating, Dr. Morse clearly considered only Yousey's level of pain caused by his headaches. Substantial evidence supports the Commission's denial of permanent-impairment benefits for Yousey's nerve injury, and we affirm.

Reversed in part and affirmed as modified in part on direct appeal; affirmed in part and affirmed as modified in part on cross-appeal.

GRUBER, C.J., and GLOVER, J., agree.

Petition for rehearing denied.

GRUBER, C.J., and KLAPPENBACH and GLOVER, JJ., agree.

9

HIXSON, J., concurs.

HARRISON and BROWN, JJ., dissent.

**KENNETH S. HIXSON, Judge, concurring.**   I reluctantly concur in the result reached by the majority in this case.  I write separately to emphasize that, if there is to be a change in the law with respect to the availability of permanent-impairment benefits for brain injuries—and there must be—it is for the legislature and not the court of appeals to make that change.

It is undisputed that appellee Rick Yousey sustained very serious work-related injuries to his head and face, as detailed in the majority opinion.  Common sense and a plethora of what the legislature has defined as subjective evidence substantiate that these severe injuries were likely the cause of Yousey's brain injury as diagnosed by his doctors.  However, because there were no objective findings to support a brain injury as required by the statute, I agree that the Commission's award of permanent benefits for a brain injury must be reversed.  Our workers' compensation law as written by our legislature dictates this result.  Pursuant to Ark. Code Ann. § 11-9-704(c)(1)(B) (Repl. 2012), any determination of the existence or extent of physical impairment shall be supported by objective and measurable physical or mental findings.

In *Rippe v. Delbert Hooten Logging*, 100 Ark. App. 227, 266 S.W.3d 217 (2007), and *Parson v. Arkansas Methodist Hospital*, 103 Ark. App. 178, 287 S.W.3d 645 (2008), we held that results of neuropsychological testing and a claimant's own testimony regarding his or her

symptoms were not adequate to establish an organic brain injury by objective findings. In each of those cases, the claimant had objective findings of physical facial and head injuries, but we affirmed the Commission's denial of benefits for a brain injury because these findings were insufficient to support a brain injury. In *Parson*, the claimant's doctor diagnosed her with a brain injury and explained that, although the MRI and EEG were normal, that did not mean there was no injury to the brain. Recognizing the dilemma in attempting to prove objectively a condition that is often undetectable with objective tests, we nonetheless affirmed the denial of benefits imploring the legislature to act where we stated "we see no way for this dilemma to be addressed other than by legislative action." *Parson*, 103 Ark. at 184, 287 S.W.3d at 649. Here we are again, almost ten years later, confronted with the same dilemma. Since we delivered *Parson* in 2008, the legislature has remained silent and not addressed the dilemma, and the law remains unchanged. In short, brain-injury law has not kept up with brain-injury science. I invite, even implore, the legislature to re-examine the requirements to prove the compensability of brain-injury claims within the Arkansas Workers' Compensation Act.

It is the General Assembly's responsibility to liberalize, broaden, or narrow the scope of workers' compensation law—not ours or the Commission's. *See* Ark. Code Ann. § 11-9-1001. Our charge is not to rewrite unambiguous workers' compensation statutes, and in fact, we are statutorily prohibited from doing so. I am constrained to follow the law. For these reasons, I reluctantly concur with the majority's decision that reversed the award of

11

permanent benefits for a brain injury.

**BRANDON J. HARRISON, Judge, dissenting.**

This accident was horrific. [The utility truck with a boom lift known as] the Devil Unit didn't just flip over, it actually body slammed him down. [I] went around to [Rick] and held him in my arms until–he was trying to breathe and I called 911, and told them we had somebody down. He was just kind of focusing on being able to breathe and I was focusing on making sure that he knew I was there and that he wasn't alone[.] I was concerned whether Rick was going to survive. He is my friend. I was relieved when I got to Rick and he was breathing.

–Kevin McDonald, coworker and eyewitness

★ ★ ★

The first surgery I had was my face. They tried to put the bones back together. I've got screws and plates where they couldn't get the bone in and they went in through my eye and my nose and my mouth to do just the face. The next surgery was eye surgery. They tried to bring my eye out and correct it. It was pushed back approximately an inch and a half. They were not able to get it completely aligned.

–Rick Yousey, injured worker

★ ★ ★

I also noted post-traumatic encephalopathy. Encephalo is brain; pathy is something wrong. Something is wrong with his brain. There's a lot of evidence in front of us that he does have a brain injury. He didn't just hit his head. He had a severe skull fracture. This is the worst thing I've ever seen [in approximately 40 years]. He's lucky to be alive.

–Dr. Michael W. Morse, treating neurologist (board certified)

★ ★ ★

[Rick] has misalignment of the two eyes. That's a result of the fractures of his face from this injury. He did have some surgery to try and align the eyes. From what I understand, one of the key things they were looking at was to reposition the eye because it was sunken. They were able to improve the position of the eye, but they

were not able to correct the alignment. I suspect there is also some permanent damage to tissue as a result of these traumatic injuries.

–Dr. Andrew Lawton, ophthalmologist/neuro-ophthalmologist

★ ★ ★

Gallagher Bassett referred Mr. Yousey to me. I guess [it] wanted an assessment of how much cognitive impairment or dysfunction there was secondary to the head injury. Dr. Morse (Rick's neurologist) recommended a neuropsychological evaluation.

I gave [Rick] a bunch of tests. It's the regular battery of neuropsychological tests that are administered. One was an intelligence test and then there's motor speed tests and visual perception tests and there's time tests. All of these have been selected over the years in terms of how sensitive they are to brain dysfunction, so there's about 12 tests I gave him.

In laymen's terms, my diagnosis of Mr. Yousey is dementia, which has a negative connotation like Alzheimer's, but dementia also means brain dysfunction from whatever source, and then the diagnosis–the source is head injury.

At some point in time I gave Mr. Yousey a permanent impairment.

–Dr. Richard Back, treating clinical neuropsychologist

★ ★ ★ ★ ★

I'll quickly remind both the majority and my concurring colleague that the existence and extent of a permanent impairment must be supported by "objective and measurable physical *or* mental findings." Ark. Code Ann. § 11-9-704(c)(1)(B) (Repl. 2012) (Emphasis added). We have both in this case. On this point, this court has warned that "there is no requirement that medical testimony be based solely or expressly on objective findings—only that medical evidence of the injury and impairment be supported by objective findings."

13

SLIP OPINION

*Emergency Ambulance Serv. v. Pritchard*, 2016 Ark. App. 366, at 8, 498 S.W.3d 774, 780 (internal citations omitted). The objective-findings bar has been raised too high today, and unnecessarily so.

This court has, for more than three decades, admonished that the Commission, not us, credits and weighs the evidence, including doctors' opinions. *Hunter Wasson Pulpwood v. Banks*, 270 Ark. 404, 605 S.W.2d 753 (1980); *Black v. Riverside Furniture, Co.*, 6 Ark. App. 370, 642 S.W.2d 338 (1982). By law we are tasked to decide one ultimate question: was the Commission's decision a reasonable one? The Commission's 60-page opinion in this case cleared all the legal hurdles. So I would affirm its decision to award Mr. Yousey a modest permanent-impairment rating of 29% to the body as a whole.

I appreciate, and agree with, the concurring judge's concern about judicial lawmaking. But I'm not advocating for the judicial "liberalization" of workers'-compensation law. I'm not rewriting a statute. Contrary to the letter and spirit of the concurrence, no legislative solution is needed; what's needed is for this court to more circumspectly apply the objective-findings requirement. Here, a fidelity to our standard of review and a straightforward application of the current statute to the facts require us to affirm the Commission. This case is that simple.

Just as relieved as coworker Kevin McDonald was to find Rick breathing after he saw the Devil Unit body slam him to the ground more or less face first, and just as sure as neurologist Dr. Morse was that Mr. Yousey is "lucky to be alive" given "a severe skull

fracture," I'm as confident that the Commission justifiably awarded the modest permanent-impairment rating. The stubborn facts make the case.

*Dr. Andrew Lawton (ophthalmologist/neuro-ophthalmologist)*

Dr. Lawton saw Mr. Yousey twice. We learned from this medical doctor that Mr. Yousey's left eye orbital bones suffered a "blow out" fracture and that the force of the impact injury pushed his eye back into his head and otherwise misaligned it. All this caused his patient significant and lingering vision problems that we need not dwell on further here.

*Dr. Scott Bolding, DDS MS (performed a bone-graft from hip to jaw for dental implants)*

In March 2013, Dr. Bolding reported this regarding his consultation with Mr. Yousey on the need for dental implants:

> Patient was involved in a traumatic work injury at work on February 24, 2012. Patient was unloading a piece of steel equipment from the back of a truck when the equipment fell on him and patient struck the ground forcefully with his face. Patient had reconstructive face surgery . . . to repair fractures in maxilla [upper jaw] and around left orbit [eye]. Patient also had to have surgery on his left hand and left rotator cuff[.] Patient has been edentulous [without teeth] most of his adult life, but is no longer able to wear dentures due to facial trauma and traumatic atrophy to the maxilla [upper jaw].

*Dr. Richard Back (clinical neuropsychologist)*

Dr. Back's interview, testing, and testimony established the following facts:

- Dr. Back diagnosed Mr. Yousey with having dementia, at age 53.

- Dementia is a "brain dysfunction," and the doctor answered "yes" when asked whether "this dementia or brain dysfunction resulted from the incident at work."

- Mr. Yousey had "innumerable fractures" in his head and face.

- The neuropsychological test results were consistent with a traumatic brain injury, which Rick sustained. The results were consistent with an acceleration/deceleration injury that his head and brain would have received.

- Mr. Yousey's head injuries were consistent with having experienced a shearing force.

- Dr. Back explained that shearing is what happens when your head is quickly rotated, jerked, or twisted, even if it's just "a fourth of an inch." The sudden movement disrupts the brain cells. Even if there is not enough "separation" to show up on an MRI scan, the force still "disrupts the chemical and electrical and circuits."

- When asked: "In your opinion, is the shearing that showed up on the MRI an objective finding beyond Mr. Yousey's control?" Dr. Back said: "Yes."

- Depression, anxiety, irritability, fatigue, and diminished interest were problems reported by treating physician Dr. Anne-Marie Magre, M.D. Symptoms associated with posttraumatic stress disorder (PTSD) appeared too.

- When tested after the accident, Mr. Yousey showed the mental functioning of a 12 year old, a rating far below that which holders of commercial driver licenses rate in general. Until the accident, Rick held a CDL.

- Dr. Back reported that Mr. Yousey functioned in the borderline range of mental retardation when he was tested after the accident.

- "[T]he prognosis on significant head injuries is pretty guarded in terms of anybody going—getting back to what their [preinjury] level of functioning was."

By the way, why are claimants like Mr. Yousey even seen by clinical psychologists like Dr. Back—and at the employer insurer's request in this case—if their professional opinions mean nothing under workers'-compensation laws? Why the waste of time and money and effort of the doctors and injured workers? And who are we judges to ignore a trained health-care professional's rigorous testing methods and opinions? Dr. Back has been practicing since

1980 and has given "over 1,000" neuropsychology tests like the ones Mr. Yousey took. Dr. Back agreed when asked that "[a]fter doing over 1,000 of these, I have an idea if somebody is trying to be accurate with the testing[.]"

I take the concurring judge's observation that "brain-injury law has not kept up with brain-injury science" to make a similar point. To put it more bluntly, not one shred of evidence suggests that Rick Yousey is a faker, malingerer, or master test manipulator who sought to game the system and unjustly benefit from his employer.

*Dr. Michael W. Morse (board-certified neurologist)*

Dr. Morse, a medical doctor specializing in the anatomy and physiology of the human nervous system, said that an MRI scan of Mr. Yousey's brain wouldn't allow him to state with "a hundred percent" certainty that he suffered a shear injury; but the film did not rule it out. The scan did tell Dr. Morse that the work accident caused Mr. Yousey's left eye to be "pushed back." He agreed that broken bones in Mr. Yousey's face and the displaced eye were objective findings.

The July 2012 MRI scan—which was performed almost five months after the February crush injury had occurred—couldn't even tell the whole story if it wanted to. Setting aside the nearly 150-day delay and what it may or may not have meant diagnostically, the July scan's ability to detect bleeding in Mr. Yousey's brain was admittedly absent for a more fundamental reason. Dr. Morse said that the scan was essentially normal, but that opinion was qualified on a key point: "They did not do a specific sequence looking for blood, so there's

a very sensitive way you can look for brain damage from bleeding.  That was not done on this particular scan.  . . . *I said there's no evidence of hemorrhage, but again, the most sensitive test for hemorrhage was not performed.*"  (Emphasis added).  Neither the majority nor the concurring opinions shine light on this scientific fact.  What they have implicitly required is that a five-month old diagnostic image show them a brain bleed although the test given was not even sensitive enough to detect a bleed had one occurred.  That's unreasonable.

Dr. Morse didn't just look at film.  He treated Rick.  Laid hands on him.  Judged him as highly trained medical professionals are taught to do.  Even stuck needles into the back of Rick's head on multiple occasions to partially and temporarily relieve him of chronic headaches he has suffered since 2012 —a "last resort for most people," in the doctor's words.

The neurologist also said,

> Something is wrong with his brain. . . . There's a lot of evidence in front of us that he does have a brain injury.  He didn't just hit his head.  He had a severe skull fracture.  This is the worst thing I've ever seen [in approximately 40 years].  He's lucky to be alive.

Pause and let this core opinion echo:  "Something is wrong with his brain. . . . There's a lot of evidence in front of us that he does have a brain injury."

If more is required from Dr. Morse, we have it.

> The base of your skull, the bottom of your skull right above your eyes is real rough, so when you have a head injury, your brain swirls around and is rubbed up against those rough surfaces and some bruising at the very bottom of your brain and the classic symptoms of that are loss of smell and taste (which Mr. Yousey suffers). . . . You can get personality changes from that.  He had

18

> a period of amnesia which indicated his head injury was significant. It wasn't just his face. His brain was injured.

The Commission accepted this opinion.

Returning to the objective-findings point on which the majority and concurring opinions have run aground, Dr. Morse agreed with Dr. Back's assessment that Mr. Yousey's left hand seemed to be impaired, which suggested a right hemisphere dysfunction consistent with a brain injury. If a neurologist with decades of clinical experience agrees with an experienced psychologist's battery of tests and the conclusions the psychologist makes from the tests, who are we to discount their opinions? Dr. Morse also saw photos of Mr. Yousey's condition after the accident and said that the diagnostic images contained objective findings that were consistent with a brain injury. A February 2012 CT scan of Rick's face concluded this way, "Impression: Innumerable facial fractures bilaterally." Again, Dr. Morse agreed that the CT scan was an objective finding.

The majority's decision doesn't, of course, just affect Mr. Yousey. Future head-trauma victims will immediately find themselves in an out-of-touch legal landscape if they are badly injured while working. If it was hard for a claimant to establish a compensable brain injury before today, the majority's abrupt shift in this case has created a nearly impossible burden for real-world people who face real-world dangers.

Our decisions in the head/brain-injury context have not been entirely consistent, which I grant is a difficult task to achieve. But one thing is clear: the claimants' injuries in the cases I have read don't come close to Rick's horror.

19

SLIP OPINION

Consider one recent example of a brain-injury case, *Myers v. City of Rockport*, where this court affirmed the Commission's finding that there was no compensable head injury—primarily because the car-wreck victim presented initially with a sore shoulder but no indication of a head injury and "there were no complaints regarding [the claimant's] head or brain having been injured in the accident until more than two years following" the motor-vehicle accident. 2015 Ark. App. 710, at 9, 479 S.W.3d at 40. The dissent in *Myers* was concerned that testimony about severe daily headaches, memory issues, personality changes and deficient verbal/auditory skills was overlooked.

Here we tragically have it all: (1) a severe head-trauma/facial-disfigurement accident of a sort not even dreamed of in *Myers*, or in any other case I have read; and (2) evidence of many emotional and behavioral problems that the dissent in *Myers* rightly thought was important on the brain-injury question.

Coworker McDonald said the accident was horrific and that he was concerned whether Rick was going to survive. In Dr. Morse's judgment, while speaking on his patient's difficulty swallowing after face- and jaw-reconstruction surgeries, Mr. Yousey experienced a traumatic crushed head. Thankfully the crush stopped (just shy) of killing him or placing him in a vegetative state. That's the good news.

The bad news is that Rick's physical, behavioral, and emotional well-being was incontrovertibly and permanently changed for the worse immediately after a work accident involving his face, skull, eye, jaw, shoulder (rotator cuff), knee, hand, and foot. Yet this court

now denies him a benefit that the Commission saw fit to award on a deep factual and medical record.

Given the majority's choice—which upends our standard of review and creates a lopsided precedent—a worker must apparently suffer a head injury gruesome enough to attract a hungry horde of Zombies before he or she can prevail before the Commission and retain even a modest award on appeal.  I dissent because, unlike my colleagues, I don't believe the General Assembly would bless such a result for the men, women, and families it represents.

BROWN, J., joins.

*Bassett Law Firm LLP*, by: *Curtis L. Nebben*, for appellants.

*Cullen & Co., PLLC*, by: *Tim Cullen*; and *Jason M. Hatfield, P.A.*, by: *Jason M. Hatfield*, for appellee.